4 P.3d 508

**In the Matter of the GUARDIANSHIP
OF Jane DOE, A Minor**

No. 22469.

Intermediate Court of Appeals of Hawai'i.

May 19, 2000.

Michael A. Glenn, on the briefs, for Mother–Appellant.

P. Gregory Frey and Sheila Sue–Noguchi (Coates & Frey), on the briefs, for Grandparents–Appellees.

BURNS, C.J., WATANABE, and ACOBA, JJ.

Opinion of the Court by ACOBA, J.

We hold that in a proceeding brought by a parent to remove a non-parent as a guardian of the parent's minor child, the family court must consider the preference granted to parents in Hawai'i Revised Statutes (HRS) § 571–46(1) (1993) in determining whether under HRS § 560:5–212 (1993), it is in the best interest of the child to terminate the guardianship.

We conclude that although the family court of the first circuit (the family court) did not expressly refer to the parental preference, resolution of the evidence before it supported continuation of the guardianship over the child (Child) of Appellant–Mother (Mother) by Appellees–Grandparents (Grandparents).[1]

Additionally, we hold that Mother failed to show a material change in circumstances in

1. For confidentiality purposes, "Mother" is used in referring to Appellant, "Grandparents" is used when referring to Appellees, and "Child" is used when referring to the subject minor.

seeking a change in visitation rights, and that her request for a custody evaluation filed after a hearing on the issue of custody was moot.

Thus, we affirm the family court's March 31, 1999 order denying Mother's motion to terminate Grandparents' guardianship, and the April 9, 1999 order denying Mother's motion for unsupervised visitation and for a custody evaluation.

## I.

Child was born on October 8, 1993, in Honolulu, Hawai'i. Grandparents began caring for Child when Child was about one year old. When Child was almost two years old, Mother gave Grandmother a one-year power of attorney for Child's medical needs.[2] In January 1996, Mother left Honolulu to attend an educational program on the mainland. During this time, Child continued to reside with Grandparents. Mother returned to Honolulu on three occasions in 1996. She represented that during one such visit, Grandparents agreed that "[i]f [Mother] signed over legal guardianship then they'll go ahead and pay for [Mother's] education."

On August 5, 1996, Grandparents filed a petition with the family court pursuant to HRS § 560:5–102 (1993) for guardianship of Child.[3] The petition stated that "[s]uch

guardianship is necessary because [Child] is presently living with [Grandparents], therefore, power and authority to consent to any procedures necessary for [Child's] health, welfare and best interests should be legally vested with [Grandparents]. The appointment will legally provide [Grandparents] with the full care, custody and control of [Child]."

On September 24, 1996, Grandparents' attorney filed an acknowledgment of service and consent to the petition signed by Mother. This document indicated that Mother had been informed of the hearing on Grandparents' guardianship petition, stated that she had "no objection to the appointment of [Grandparents] as legal co-guardians for [Child]," and included her notarized signature.

On October 2, 1996, the family court granted temporary letters of guardianship of the person to Grandmother "for the purpose of providing care and attention for [Child] and having custody thereof, and of performing all procedures necessary for [Child's] health, welfare and best interests pursuant to [HRS § 560:5–209 (1993).]"

■ On October 17, 1996, the family court granted Grandparents' petition and awarded them guardianship of Child (guardianship order).[4] The guardianship order did not set

---

**2.** This power of attorney was not made part of the record.

**3.** Hawai'i Revised Statutes (HRS) § 560:5–102 (1993) states:

The court has jurisdiction over protective proceedings and *the family court has jurisdiction over guardianship proceedings.* Where protective and guardianship proceedings relating to the same person have been initiated, they may be consolidated in the court or in the family court as the court and the family court in the exercise of their discretion shall determine.

(Emphasis added.) HRS § 560:1–201 (1993) defines "court" as "the circuit court having jurisdiction in matters relating to trusts and the estates of decedents, missing persons, protected persons, minors and incapacitated persons." Neither article 1, which governs general provisions of HRS chapter 560, nor article 5 of said chapter, which governs guardianships, contain any definition for "family court."

**4.** The October 17, 1996 order of the family court of the first circuit (the family court) granting

Grandparents guardianship of Child contains two errors. First, the order stated that Child was "a minor as defined in HRS Section 560:5–101(2)." Second, the order appointed Grandparents "for the purpose of providing care and attention for said minor and of performing all procedures necessary *for the incapacitated person*'s health, welfare and best interests *pursuant to [HRS §§ 560:5–312* and 560:5–312D.]" (Emphases added.)

These statements are incorrect because they pertain to guardianship of an incapacitated person. Minority is not an incapacitated status. HRS § 560:5–101(2) (1993) defines "incapacitated persons" as "any person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, advanced age, chronic use of drugs, chronic intoxication, or other cause (*except minority*) to the extent that the person lacks sufficient understanding or capacity to make or communicate responsible decisions concerning one's person[.]" (Emphasis added.) The correct statutory basis for Grandparents' guardianship is found in HRS § 560:5–101(5), which states in relevant part that "[a] 'minor

forth any visitation rights for Mother. In pertinent part, it states:

4. [Child] is a minor as defined in [HRS § 560:5–101(2);

5. Appointment of co-guardians of the person of minor is in the best interests of the minor and is necessary in order to provide continuing care and supervision of said minor; and

6. [Grandparents] are fit and proper persons to serve as co-guardians.

NOW THEREFORE, IT IS HEREBY ORDERED THAT [GRANDPARENTS] be and is [sic] hereby appointed co-guardians for the person of the minor above named, for the purpose of providing care and attention for said minor and of performing all procedures necessary for the incapacitated person's health, welfare and best interests pursuant to [HRS §§ 560:5–312 and –312D[.[5]]

. . . .

IT IS HEREBY FURTHER ORDERED that [Grandparents] shall . . . be discharged upon the death of the minor, or upon the death, resignation, removal or determination of incapacity of the guardian or upon further order of the [family c]ourt. . . .

ward' is a minor for whom a guardian of the person has been appointed *solely because of minority."* (Emphasis added.)

Furthermore, the order bases guardianship on HRS § 560:5–312, which enumerates the powers and duties of a guardian of an incapacitated person, and HRS § 560:5–312D, which applies in cases where the ward is deemed by the family court to be mentally retarded. The correct basis for granting a guardianship in this case is found in HRS § 560:5–209 (1993), which governs the powers and duties of a guardian of the minor's person. The order granting temporary guardianship of Child to Grandmother correctly cited HRS § 560:5–209 as the basis for the temporary guardianship order. However, the October 17, 1996 order erroneously relied on HRS §§ 560:5–312 and –312D.

Because it is clear to us that Grandparents intended to create a guardianship for the person of the minor, the family court intended to order such a guardianship, and all of the parties here proceeded on that basis, we treat the guardianship order in the instant case as granting a guardianship for the person of a minor despite these procedural errors. On remand, however, the family court should amend the erroneous statements *nunc pro tunc.*

That same day, letters of guardianship were issued to Grandparents, stating that they were appointed co-guardians of Child for the purpose of providing care and attention for [Child] *and having custody thereof, and of performing all procedures necessary for [Child's] health, welfare and best interests pursuant to [HRS § 560:5–209] . . . .*

(Emphasis added.) The letters further stated that Child's parents were foreclosed from exercising the powers granted to Grandparents and Grandparents were subject to discharge upon certain conditions:

The parents of [Child] shall not exercise, without the consent of [Grandparents], the powers and duties which are hereby granted to [Grandparents] pursuant to [HRS § 560:5–209].

[Grandparents] . . . shall be discharged . . . upon the further order of the [c]ourt. . . .

In relevant part, HRS § 560:5–209 states that "[a] guardian of the person of a minor has the powers and responsibilities of a parent who has not been deprived of custody[.]" [6]

Mother returned to Honolulu in February 1997. According to a September 3, 1998

5. *See supra* note 4.

6. In part, HRS § 560:5–209 states

**Powers and duties of guardian of the person of the minor.** A guardian of the person of the minor has the powers and responsibilities of a parent who has not been deprived of custody of the parent's minor and unemancipated child, except that a guardian of the person is not legally obligated to provide from the guardian's own funds for the ward and is not liable to third persons by reason of the parental relationship for acts of the ward. In particular, and without qualifying the foregoing, a guardian of the person has the following powers and duties:

. . . .

(3) The guardian of the person is empowered to facilitate the ward's education, social, or other activities and to authorize medical or other professional care, treatment, or advice. . . .

(4) A guardian of the person must report the condition of the guardian's ward and of the ward's estate . . . as ordered by the family court on petition . . . or as required by court rule.

affidavit by Grandmother, Mother had moved into a rental home located next to their residence. We are unable to discern from the record whether Mother, her husband (Husband), and their child continue to live there.

On September 10, 1998, Grandparents moved for seeking appointment of a "CGAL" (GAL) [7] on behalf of Child to investigate Mother's visitation with Child,[8] supervised visitation with Mother only at the PACT [9] Visitation Center, psychological evaluation of Mother, and the turnover of Child's passport to Grandparents. In an October 7, 1998 order, the family court denied Grandparents' motion without prejudice. However, the order allowed that the "motion may be orally revived" if Mother moved either for termination of guardianship or visitation rights.

On October 30, 1998, Mother filed a family court form entitled "Motion and Affidavit for Relief After Order or Decree, and Order to Show Cause for Relief After Order or Decree" (the termination motion). The preprinted affidavit stated in part:

THE UNDERSIGNED AFFIANT MOVES for the relief set forth in the ORDER TO SHOW CAUSE which is attached. In [s]upport of this request the following statement is made:

(If existing orders re child custody and/or visitation are involved)

1. The best interests of the minor child of the parties require that [an] existing order regarding custody and/or visitation be modified as follows:

Mother completed the form as follows:

The [guardianship order f]iled on October 17, 1996 should be dissolved and custody of [Child] should revert to her [n]atural [m]other[.[10]]

Under the heading "RELIEF SOUGHT," the box next to the statement, "Why existing orders with respect to the custody of and/or visitation with the minor child should not be modified[,]" was marked. Neither the motion nor the affidavit cites to any statute.

On November 24, 1998, Grandparents filed a motion seeking again, *inter alia*, the appointment of a GAL to investigate proposed conditions of Mother's visitation.[11] The family court orally denied this motion at a November 25, 1998 hearing.[12] The family

---

**7.** Grandparents' motion does not define "CGAL." We presume CGAL refers to a guardian ad litem for the child. Rather than CGAL, we use GAL herein, where appropriate.

**8.** Grandparents' motion did not refer to any statute.

**9.** "PACT" is an acronym for Parents and Children Together.

**10.** The affidavit further states:

4. The facts upon which this application for relief is made are as follows:

In 1996, [Mother] moved to the mainland in an attempt to better herself through education. She left [Child] in the care of [Grandparents]. Approximately six months later [Mother] was informed by [Grandparents] that she must sign guardianship papers in order for them to obtain medical insurance for [Child]. In addition[,] they promised to pay for all of [Mother's] education if she signed the [g]uardianship papers. Under the influence of these false statements, [Mother] agreed to allow [Grandparents] to be appointed temporary [g]uardians of [Child]; only untill [sic] she returned to Hawaii. [Mother] sent a notarized letter spelling out this agreement to [Grandparents], who agreed to present it to the presiding judge at the [g]uardianship hearing. They did not show this letter to the judge, nor did they pay for

[Mother's] education. When [Mother] returned to Hawaii and asked for [Child] back[, [Mother]. More recently, they have attempted to cut off all contact between [Child] and [Mother]. Furthermore, [Grandmother] continually tries to alienate [Child] from [Mother] by repeatedly telling [Child] that [Mother] is not her natural mother. [Mother] believes this is psychologically damaging to [Child]. The child's natural father ... also believes that [Mother] should have custody of [Child]. (See Attached Notarized Letter). An expert [p]sychiatrist also recommends that [Mother] be given full custody of [Child]. (See Attached Affidavit). *Considering all of the above facts, dissolving the [guardianship o]rder and awarding full custody of [Child] to [Mother] is prudent and proper, and serves the best interest of [Child]*.

(Emphasis added.)

**11.** *See supra* note 8.

**12.** The family court rejected the argument raised by Grandparents' counsel as follows:

[GRANDPARENTS' COUNSEL]: Judge, ... you're looking at [M]other's fitness which brings to question her mental health.

You're also looking at her ability to provide a fit and whole [sic] home for [Child]..

THE COURT: Yes.

court's subsequent written order concerning the matters discussed at the November 25, 1998 hearing was filed on February 1, 1999, but did not refer to the family court's oral decision denying Grandparents' request for a GAL.

A hearing on Mother's termination motion was held on March 1, 1999. The family court denied this motion, and ordered that "the [c]o-[g]uardianship vested in [Grandparents] is hereby reconfirmed."

On March 18, 1999, Mother filed a motion for unsupervised visitations and for a custody evaluation (the visitation/custody motion).[13] Mother's supporting affidavit stated, *inter alia,* that she had never harmed her children and was not a danger to them or to anyone else. The affidavit also related that she had been active in Child's life since Child's birth, and that "this [c]ourt must receive a fair and impartial evaluation of the positive relationship between [Child] and [Mother] and [Child's] half-sister and [s]tepdad" in order to be "allowed to have [Child] returned to [her] from [Grandparents]."

Grandparents filed a memorandum in opposition to the visitation motion, attaching their counsel's affidavit. In Grandparents' counsel's affidavit, he argued that the motion was a pre-trial motion and because the hearing had been conducted on March 1, 1998, the motion was untimely. Counsel also represented that Mother had opposed Grandparents' September 10, 1998 and November 24, 1998 motions for appointment of a GAL "to investigate and report on issues regarding [M]other's visitation and conditions of contact with [Child]," Mother had not contested the family court's denial of such motions, and Mother had not filed her own motion for appointment of a GAL.

> [GRANDPARENTS' COUNSEL]: In this case a [GAL] is the one who—
> . . . .
> — would be looking at that situation.
> THE COURT: It could be.
> Also it's your burden of proof.
> I don't want to defer the burden of proof to a [GAL].
> . . . .
> I want to defer the burden of proof to the appropriate party.

On March 31, 1999, the family court issued an order denying the termination motion and reconfirming Grandparents' co-guardianship. On April 9, 1999, the family court filed an order denying Mother's visitation/custody motion. On April 29, 1999, Mother filed her appeal from the March 31, 1999 and the April 9, 1999 orders.

The case was temporarily remanded on January 4, 2000 for entry of findings of fact (findings) and conclusions of law (conclusions) in accordance with Hawai'i Family Court Rules (HFCR) Rule 52(a) [14] *See State v. Gonsales,* 91 Hawai'i 446, 449, 984 P.2d 1272, 1275 (App.) (per curiam), *aff'd.,* 92 Hawai'i 688, 994 P.2d 620 (1999) (stating that "upon the filing of an appeal, the family court is mandated, where HFCR Rule 52(a) is applicable, to enter written findings and conclusions, unless they were previously set forth in a written decision or decision and order").

On March 3, 2000, findings and conclusions relating to Mother's termination motion (termination conclusions) were filed. Termination conclusion 5 states, "It is this [c]ourt's position that the only standard which really needs to be applied in this · case is 'best interests' of the child pursuant to [HRS §] 560:5–212 [ (1993) ]." [15] Termination conclusion 10 states, "It is in [Child's] best interests for the existing [g]uardianship to remain in effect."

Also on March 3, 2000, findings and conclusions relating to the visitation/custody motion (visitation findings/ conclusions) were filed.

## II.

 Initially, we point out that although the termination motion was styled as an or-

13. Mother's motion did not indicate that she sought a social study pursuant to HRS § 571–45 (1993).

14. Hawai'i Family Court Rules (HFCR) Rule 52(a) states in relevant part that "upon notice of appeal filed with the court, the court shall enter its findings of fact and conclusions of law where none has been entered, unless the written decision or 'decision and order' of the court contains findings of fact and conclusions of law."

15. *See infra* page 517.

der to show cause after order or decree, we look to the substance of Mother's motion and construe it as a petition for removal pursuant to HRS § 560:5–212. *See State v. Timoteo,* 87 Hawai'i 108, 111, 952 P.2d 865, 868 (1997) (stating that the defendant's " 'motion to dismiss' was the functional equivalent of a post-verdict motion for judgment of acquittal ... and, for the purpose of [the] appeal, [appellate courts] will construe it as such"); *Sturkie v. Han,* 2 Haw.App. 140, 143, 627 P.2d 296, 300 (1981) (construing a motion to set aside an interlocutory decree of foreclosure, which cited no authority, as a Hawai'i Rules of Civil Procedure Rule 60(b) motion). HRS § 560:5–212 provides in relevant part that "[a]ny person interested in the welfare of a ward ... may petition for removal of a guardian of the person on the ground that removal would be in the best interest of the ward." Termination of guardianship is defined in HRS § 560:5–210 (1993) [16] and may be accomplished after notice and hearing on the removal petition. HRS § 561:5–212.

At the conclusion of the termination motion hearing, the family court indicated that HRS § 560:5–212 was the statute applicable to the proceedings, stating, "[The c]ourt finds and believes that [HRS § 560:5–212] is applicable in this case. That is, any person interested in the welfare of a ward may petition for removal of [the] guardian of the person [on] the ground that the removal would be in the best interest of the ward." [17]

### III.

On appeal, Mother first argues that Grandparents did not establish by clear and convincing proof that Mother was unfit or lives in an unstable home, and unless the family court so determines, she should have prevailed in the guardianship proceedings.

While she does not expressly say so, Mother thus invokes the parental rights doctrine.

▆▆▆ In doing so, she implicitly challenges the best interest of the child standard employed by the family court in termination conclusions 5 and 10. In that regard, we review challenges to "[c]onclusions of law ... under the right/wrong standard." *Camerlingo v. Camerlingo,* 88 Hawai'i 68, 73, 961 P.2d 1162, 1167 (App.1998) (citing *Wharton v. Hawaiian Elec. Co.,* 80 Hawai'i 120, 122, 906 P.2d 127, 129 (1995)). A conclusion of law "is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Bowe,* 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994) (citation omitted).

### IV.

Mother cites *In re Herlihy,* 33 Haw. 106 (1934), in asserting that Grandparents were required to establish, by clear and convincing proof, that Mother was unfit or her home unstable. *Herlihy* involved a habeas corpus proceeding brought against the child's maternal grandparents by the child's father, the sole surviving parent of a two-year-old child. *Id.* at 106. There, the Territorial Supreme Court held that a parent's claim to custody superseded that of a third party when "the right of the parent and the welfare of the child are in accord[.]" *Id.* at 108. According to it, a parent's right to custody "should not be ignored unless it has been forfeited by the parent's incapacity or unfitness to discharge parental duties as shown by clear and convincing proof." *Id.* In *Herlihy,* the supreme court construed section 3033, Revised Laws of Hawai'i 1925, as amended by Act 77 of the 1931 Legislature of the Territory of Hawai'i.[18]

16. HRS § 560:5–210 (1993) states:

**Termination of appointment of guardian of the person; general.** A guardian of the person's authority and responsibility terminates upon the death, resignation or removal of the guardian or upon the minor's death, adoption, marriage or attainment of majority, but termination does not affect the guardian's liability for prior acts, nor the guardian's obligation to account for funds and assets of the guardian's ward. Resignation of a guardian of the person does not terminate the guardianship until it has been approved by the family court.

17. In adopting termination conclusion 5, the family court implicitly acknowledged that Mother's motion was in fact a motion for removal pursuant to HRS § 560:5–212 (1993).

18. Section 33033 provided as follows:

The father and mother of an unmarried minor child are jointly the natural guardians of its person and property. They shall have equal powers and duties with respect to it and neither shall have any right superior to that of the other concerning its custody or control or any

Mother also contends the family court is bound by this court's holding in *In re Guardianship of John Doe*, 7 Haw.App. 575, 786 P.2d 519 (1990). In *John Doe*, the paternal grandparents sought temporary custody of their minor grandchild, alleging in their November 16, 1988 petition that the parents "[we]re unable to care for or support the child, and they have given physical custody of [the c]hild" to the grandparents. *Id.* at 576, 786 P.2d at 520. On March 17, 1989, the family court issued an order granting temporary guardianship to grandparents, but deferred the issue of "the circumstances of [the grandparents] obtaining physical custody of the [child]" to a California trial court, where the child's mother had filed a divorce action. *Id.* at 577–78, 786 P.2d at 521. The grandparents appealed, contending the family court erred in refusing to grant their November 16, 1988 petition. *Id.* at 579, 786 P.2d at 522.

This court held that the trial court erred, *inter alia*, in failing to determine whether the grandparents' November 16, 1988 petition was one for guardianship over the person or one for an award of the physical and legal custody of the child. *Id.* at 579, 786 P.2d at 522. Construing HRS § 571–46(1),[19] it was said that absent unfitness or an unwholesome home, a parent had priority over grandparents in any dispute relating to custody of a child:

> [I]n a contest between the mother and the paternal grandmother for a child's custody, the mother must prevail absent a valid finding that she is not a fit and proper person or has a home that is not stable and wholesome.
>
> In the absence of a valid court order to the contrary, [the parents] are equally entitled to [the c]hild's custody. Consequently, if [f]ather and/or [m]other requests the physical custody of [the c]hild from [the

other matter affecting it; provided, that, if either parent dies or abandons his or her family or is incapable for any reason to act as guardian, the guardianship devolves upon the other parent, and that, when the parents live apart, the court may award the guardianship to either of them, having special regard to the interests of the child.
The language was later incorporated into HRS § 577–3 (1993).

grandparents], the request must be granted unless [the grandparents] desiring to continue physical custody, allege in good faith that both [f]ather and [m]other are not fit and proper persons and/or have homes that are not stable and wholesome.

*Id.* at 581, 786 P.2d at 523 (citation omitted; emphasis added).

Although not raised by Mother, we note that in *John Doe*, this court "conclude[d] that HRS chapter 560 [article 5] (Protection of Persons Under Disability and Their Property) does not govern child custody disputes[,]" *id.* at 580, 786 P.2d at 522, but because the grandparents in *John Doe* sought physical and legal custody of the child, "the November 16, 1988 petition should have been expressly based on HRS §§ 571–11(3), [and] – 46 (Supp.1989)." *Id.* Thus, *John Doe* implied that a guardianship petition under HRS § 560:5–102 should refer to HRS §§ 571–11(3)[20] ·and –46 if custody of the person of the minor was sought. *Id.*

Finally, Mother, relying on *Department of Social Servs. and Hous., State of Hawaii v. Doe*, 9 Haw.App. 16, 819 P.2d 1130, *cert. denied*, 72 Haw. 618, 841 P.2d 1075 (1991), asserts that her claims to custody prevails over a grandmother's claim "in the absence of a valid court order awarding the custody of the child to a person other than the father and/or mother." *Id.* at 19, 819 P.2d at 1132. This court indicated there that when there is a preceding valid custody court order outstanding, the family court need not "enter a finding that [a parent] is not a fit and proper person or does not have a stable and wholesome home[,]" *id.* at 18, 819 P.2d at 1132, because any custody award is "subject to modification or change whenever the best interest of the child requires" under HRS § 571–46(6). *Id.* at 19, 819 P.2d at 1132.

**19.** Other than a minor change in punctuation, this statute is unchanged. *See* HRS § 571–46(1) (Supp.1999).

**20.** HRS 571–11(3) (1993) states that the family court has "exclusive original jurisdiction" in proceedings "[t]o determine the custody of any child or appoint a guardian of the person of the minor."

She maintains that such an order is lacking in this case.

## V.

*Herlihy* may be factually distinguished because it concerned a parent's attempt to regain custody of his or her child through a *habeas corpus* proceeding. Additionally, it was decided prior to the enactment of the parental preference provision set forth in HRS § 571–46(1). Now, HRS § 571–46 directly addresses who should have preference in the awarding of custody. *See* discussion *infra*. *John Doe* and *DSSH* are also factually distinguishable because unlike in those cases, there is a prior custody order in the instant case. Although Mother attempts to distinguish Grandparents' guardianship order from a custody order, we see no practical distinction in this case between such orders. *See* discussion *infra*. By stating that "*existing orders* with respect to custody of and/or visitation with the minor child should not be modified" in her termination motion, (emphasis added), Mother acknowledged that a prior custody order existed. Thus, on these grounds this case is distinguishable from the authorities she cites. We do not believe, however, that Mother's position is altogether without relevance in this case.

## VI.

We note that in the context of assigning physical custody of a minor to a guardian, the legal and practical attributes of guardianship under HRS § 560:5–209 and custody [21] of a minor under HRS § 571–46 are similar.

HRS § 560:5–209 states in part that "[a] guardian of the person of a minor has the powers and responsibilities of a parent who has not been deprived of custody[.]" *See* HRS § 560:5–201 (1993).[22] The implication

---

**21.** The term "custody" is not defined either in article 5 of HRS chapter 560 or in HRS chapter 571.

**22.** HRS § 560:5–201 states:

**Status of guardian of the person of the minor; general.** A person becomes a guardian of the person of a minor upon appointment by the family court. The guardianship status continues until terminated, without regard to the

---

of this provision, reinforced by the terms of the guardianship order and papers, is that guardians of a minor have the powers and responsibilities otherwise inherent in parenthood.[23] HRS § 571–46, which also concerns the custody award of a minor child, states in relevant part:

**Criteria and procedure in awarding custody.** ... In awarding ... custody, the [family] court *shall be guided by the following standards, considerations, and procedures:*

(1) *Custody should be awarded to either parent or to both parents according to the best interests of the child;*

(2) *Custody may be awarded to persons other than the father or mother whenever the award serves the best interest of the child.* Any person who has had de facto custody of the child in a stable and wholesome home and is a fit and proper person shall be entitled prima facie to an award of custody;

(3) If a child is of sufficient age and capacity to reason, so as to form an intelligent preference, the child's wishes as to custody shall be considered and be given due weight by the court.

(Emphases added.)

One commentator has discussed the similarities between guardianship and custody as follows:

There are significant similarities between "custody" and "guardianship." ... A guardian has the broadest range of the rights and duties of caring for a child, but *the right to custody of the child is certainly the principal attribute of guardianship of the person. For practical purposes, however, guardianship and custody are very similar concepts. Both carry with them the privileges and obligations of de-*

---

location from time to time of the guardian and minor ward.

**23.** We recognize that a guardian of the person of a minor does not have all the liabilities as a parent. According to HRS § 560:5–209, a guardian of the person of a minor "is not legally obligated to provide from the guardian's own funds for the ward and is not liable to third persons by reason of the parental relationship for acts of the ward."

cision-making and the daily care of the child; the custody decision and the guardianship decision both determine the primary residence of the child.

Kaas, *Determining Detriment to the Child in Third–Party Custodian Cases in Connecticut*, 17 W. New Eng. L.Rev. 205, 218 (1995) (hereinafter *Determining Detriment* ) (emphasis added; footnotes omitted). Because these concepts share common attributes, we construe the custody guardianship provision of HRS § 560:5–209 and the custody provision in HRS § 571–46 *in pari materia* in order to determine the appropriate standard to be applied where conflicting claims between parents and non-parents are made in a guardianship hearing. *See* HRS § 1–16 (1993) ("Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other.").

### VII.

■ According to HRS §§ 560:5–204 (1993) and –206 (1993), the family court may appoint as a guardian "any competent person whose appointment would be in the best interest of the minor[.]"[24] Thus, a guardian may be appointed for a minor even where the parental rights of the minor's parents have not been terminated. Pursuant to HRS § 560:5–207(b) (1993), the family court may appoint a guardian if all the statutory procedural elements have been met and if "the welfare and best interests of the minor will be served by the requested appointment[.]" Under HRS § 560:5–212, removal of a guardian is based on "the best interest of the ward." Plainly, these statutes generally instruct that the best interest of a child is the standard referred to in a minor's guardianship proceeding.[25]

Unlike the guardianship provisions, however, HRS § 571–46 sets out a specific preference for assigning custody of a minor child. The enactment of HRS § 571–46 in 1965, while not expressly stating dissatisfaction with the discretion granted to the family court, reveals the legislative intent that cer-

24. Hawai'i incorporated the Uniform Guardianship and Protective Proceedings Act (UGPPA) as part of its adoption of the Uniform Probate Code later enacted as HRS chapter 560) in 1976. Unif. Guard. Protective Proc. Act, Table of Jurisdictions Wherein Act Has Been Adopted, 8A U.L.A. 439 (1999). *See also* 1976 Haw. Sess. L. Act 200, § 1, at 58; Senate. Conf. Comm. Rep. No. 24–76, in 1976 Senate Journal, at 850. The UGPPA was designed to stand either as a separate act or to be integrated into the probate code. Unif. Guard. Protective Proc. Act, Historical Notes, 8A U.L.A. 440 (1999).

The UGGPA provision states that "[t]he [c]ourt may appoint a guardian for an unmarried minor if all parental rights have been terminated or suspended by circumstances or prior court order[.]" Unif. Guard. Protective Proc. Act, 8A U.L.A. § 2–104, 470. Similarly, HRS § 560:5–204 (Supp.1977) stated in relevant part that "[t]he family court may appoint a resident of this [s]tate as a guardian of the person for an unmarried minor if all parental rights of custody have been terminated or suspended by circumstances or prior court order." The uniform laws committee explained that two purposes were served by requiring such termination or suspension. "First, it prevents use of guardianship proceedings as a weapon or tactic in a squabble between parents concerning child custody" and "[s]econd, it establishes that a guardian by parental appointment is as completely endowed with authority as a guardian as one appointed by a court order." Unif. Guard. Protective Proc. Act, Comment, 8A U.L.A. § 2–104, 471.

However, in 1977, Hawai'i legislators amended HRS § 560:5–204, deleting the language requiring termination or suspension of parental rights. Thereafter, section 560:5–204 (Supp. 1978) stated in relevant part that "[t]he family court may appoint a resident of this [s]tate or a nonresident nominated by the will of a parent as a guardian of the person for an unmarried minor." The committee report reveals only that the amendment was intended to allow a nonresident to be appointed as a guardian in accordance with a parent's will. Senate Conf. Comm. Rep. No. 33, in 1977 Senate Journal, at 865. The committee did not explain the reason for removing the requirement of termination or suspension of parental custody rights as a prerequisite to appointment of a guardian.

Thus, the statute permits the appointment of a guardian for a minor even when parental rights have not been terminated.

25. The issues of fitness and ability to provide a stable and/or proper home are mentioned in a handful of statutes in the chapter governing the family courts. *See* HRS § 571–46 (Criteria and procedure in awarding custody and visitation); HRS § 578–2 (1993) (Consent to adoption); § 578–8 (Supp.1999) (Hearing; investigation; decree); HRS § 571–61 (1993) (Termination of parental rights; petition). HRS § 571–46(2) states that a non-parent who is a "fit and proper person" and who has had "de facto custody" of a child in a stable home is "entitled prima facie" to custody.

tain standards be followed. The purpose of HRS § 571–46 was "to enact standards for the guidance of the court and of interested parties with relation to child custody and visitation." Senate Stand. Comm. Rep. No. 312, in 1965 Senate Journal, at 967. HRS § 571–46 establishes that custody should be awarded, first, to either of the child's natural parents or to both of them "according to the best interests of the child[.]" Second, discretion inheres in the family court, after giving preference to the "father or mother[,]" to award custody to "other" persons "whenever the award serves the best interest of the child." Assuming a child's age and capacity to make the choice, a person of the child's choosing will be given due weight and consideration.

Thus, this court stated in *In re Doe,* 7 Haw.App. 547, 784 P.2d 873 (1989), that "[o]n the subject of best interests, HRS § 571–46(1) accords priority to the child's parents" and other than the priority to the child's family in foster custody cases under HRS § 587–2, "[t]here are no other statutory priorities." *Id.* at 556, 784 P.2d at 879. *See also In re Female Child by Doe,* 85 Hawai'i 165, 938 P.2d 1184 (App.1997) (recognizing the parental priority in HRS § 571–46(1)).

## VIII.

We note that the standards applied by courts in assigning physical custody of a child usually fall into three broad categories.

First, the parental rights doctrine "stands for the proposition that the parent or parents are entitled to the custody of their children unless it clearly appears that they are unfit or have abandoned their right to the custody or unless there are some extraordinary circumstances which require that they be deprived of custody." Annot., *Award of Custody of Child Where Contest is Between Child's Parents and Grandparent,* 31 A.L.R.3d 1187, § 5 (1970) (hereinafter Annot., *Award of Custody,* 31 A.L.R.3d 1187). "The parental right doctrine basically holds that as between a minor child's parent and [the minor child's] grandparent, the parent is entitled to custody where he [or she] has not abandoned the child and is not unfit to have custody of [the minor child], and there are no other extraordinary circumstances requiring that he [or she] be deprived of custody." *Id.* It has been suggested that most courts using this standard "rarely, if ever, evaluate the interests of the child." Haynie, *Biological Parents v. Third Parties: Whose Right to Child Custody is Constitutionally Protected?,* 20 Ga. L.Rev. 705, 709 n. 15 (1986) (hereinafter *Biological Parents* ).

Second, a majority of the states apply an intermediate "parental presumption" standard, which favors the biological parent, and is rooted in the rationale that custody with the natural parent serves the best interest of the child. *Id.* at 711; Blotner, *Third Party Custody and Visitation: How Many Ways Should We Slice the Pie?,* 1989 Det. C.L.Rev. 163, 165 (1986) (hereinafter *Third Party Custody and Visitation* ). Non-parents, however, may rebut the presumption favoring the parent. *Biological Parents, supra,* at 711; *Third Party Custody and Visitation, supra,* at 166. The strength of the presumption varies from each jurisdiction, and this standard is further divided into three subcategories.[26]

26. Under the fitness presumption standard, "courts presume that the natural parent is the best parent unless the nonparent can prove extraordinary circumstances exist that make the natural parent less fit than the nonparent." Haynie, *Biological Parents v. Third Parties: Whose Right to Child Custody is Constitutionally Protected?,* 20 Ga. L.Rev. 705, 712 (1986) (hereinafter *Biological Parents* ). Because courts which apply this presumption "require a showing that the natural parent is essentially unfit," the burden of the non-parent is "almost unsurmountable." *Id.* Under the convincing presumption standard, "the nonparent must show by clear and convincing evidence that the child's best interests dictate nonparental custody. If the nonparent fails to meet this burden, the natural parent has an absolute right to custody." *Id.* at 715–16. As in the fitness presumption standard, there is a high probability that the biological parent will receive custody. Finally, under the disappearing presumption standard, the court considers "any appropriate factors relating to the child's physical and psychological well-being." *Id.* at 719. The non-parent bears the burden of proof, but upon showing "any evidence, the presumption disappears, and the nonparent must prove only by a preponderance of the evidence that an award of custody in his [or her] favor is in the child's best interests." *Id.* at 720. The disappearing presumption standard is the least difficult for the non-parent to meet.

Finally, the best interest of the child standard

focuses solely on the interests of the child and treats the legal status of the putative custodians as largely irrelevant. A best interest test defines the relative benefits to the child of being with one or the other party. It requires the court to compare the total package of attributes of the two potential custodians: their homes, their larger environments, and their relationships with the child.

*Determining Detriment, supra,* at 221–22 (footnotes omitted). Under this standard, the claims of each party are "on an equal footing, with neither party bearing the burden of proof." *Biological Parents, supra,* at 722. "Since the true objective of a court in any custody dispute is to protect and help the child, these courts require, similar to custody battles between natural parents, that each party present evidence that awarding custody in his [or her] favor would serve the child's best interests." *Id.*

Despite these labels, it has been contended that "no court adopts an absolute standard, and the standards tend to blend into each other along the spectrum." *Id.* at 706 n. 4. It has been posited that the conflict between the parental rights doctrine and the best interest of the child standard "is more apparent than real" and both have been used by courts "probably ... due to the fact that both doctrines seek the same basic objective from two different approaches." Annot., *Award of Custody,* 31 A.L.R.3d 1187, § 5 (footnote omitted). Between the poles of these two views lie the majority of jurisdictions which attempt to accommodate the virtues of both by employing, in a "best interests" test, a rebuttable presumption in favor of the parents.

27. We agree that in applying the best interest of the child standard, "it is not sufficient to prove the poverty of the parent, and that financial benefit will come to the child from separation, or that the parent has faults of disposition and behavior somewhat unusual and trying." *In re Herlihy,* 33 Haw. 106, 109 (1934).

28. One commentator interprets HRS § 571–46(2) as establishing a priority in favor of the non-parent, over the parental priority in HRS

It has been suggested, for instance, that in using the "best interest" test, some courts, in disputes between parents and grandparents, have employed a presumption, subject to rebuttal, that the best interests of the child will be served by [the child's] living with the parents. These courts also reason that it has been the experience of mankind that the natural parent can be expected to provide a better life for the child than a stranger. This presumption usually leads to the same result as a factual determination of the best interest of the child.

*Id.* Another commentator has come to a similar conclusion:

At one end of the spectrum fall the strict "parental rights" jurisdictions, which base a parent's right to custody on the fitness of the parent and his [or her] biological tie to the child. At the opposite end of the scale are the "best interests" jurisdictions, which base custody exclusively on the child's needs and welfare. *The standards in between defy easy characterization, but most give preference to the biological parent in the form of a rebuttable presumption.*

*Biological Parents, supra,* at 706 (emphasis added.) Because the preference for parents established in HRS § 571–46(1) is coupled with the best interest standard,[27] we believe our jurisdiction is similar to the majority of jurisdictions which adopt a custody presumption in favor of parents subject to rebuttal.

### IX.

 Construing HRS §§ 560:5–209 and 571–46 *in pari materia,* we believe that in answering the question in guardianship proceedings of the appropriate placement of a child, the preference established in HRS § 571–46 is expressive generally of the legislature's intent in vesting custody of a minor child.[28] Accordingly, in determining the best

§ 571–46(1). Kaas, *Breaking Up a Family or Putting it Back Together Again: Refining the Preference in Favor of the Parent in Third–Party Custody Cases,* 37 Wm. and Mary L.Rev. 1045, 1070–71 (1996). Citing HRS § 571–46(2), Kaas states that "[t]he Hawaii custody statute provides that the court must decide removal cases on the basis of the child's best interests but establishes a presumption in favor of the nonparent in reunification cases."

interest of the child in guardianship proceedings,[29] the family court must consider the preference given to parents in deciding a custody award as among contending parties.[30]

### X.

■ While we believe a family court should expressly consider the parental preference in determining whether a non-parent should be granted guardianship over a minor child, we are convinced that the family court considered factors it would have evaluated in applying the parental preference.

A psychologist and a psychiatrist were appointed by the family court to conduct independent medical examinations of Mother. Specifically, the psychologist, who evaluated Mother's record when she was first admitted to Kahi Mohala in 1989, testified that he "was struck by the stark similarities . . . [of] evalu-

ation behavior—between the [1989] evaluation and the [1999] evaluation." The psychologist noted that the 1989 evaluation "seemed to indicate that [Mother's] behavior during the testing was one in which she would put herself down and at times become hostile and oppositional[.]"[31] The psychiatrist related that during his interview with Mother, she had minimized the significance of her admission to Kahi Mohala at the age of fifteen, it was his "clinical impression that [Mother] did not really understand that her own behavior was problematic for herself and for other people[, and] she had a tendency to not take responsibility for things[.]" Mother's sister, Child's aunt, testified that "[Mother has] been very physically abusive to [her] . . . [m]entally, physically, everything."[32]

To prove her fitness as a parent, Mother presented testimony from her psychiatrist[33] and a neighbor and family friend.[34] At the

---

**29.** In light of our holding that the parental preference applies in guardianship proceedings, we believe it unnecessary that a guardianship petition which seeks physical custody of a minor allege the family court's jurisdiction under HRS §§ 571–11(3) and –46 as implied in *In re Guardianship of John Doe*, 7 Haw.App. 575, 786 P.2d 519 (1990).

**30.** *But see Biological Parents, supra,* at 721 n. 58 (citing HRS § 571–46(2), and stating that Hawai'i "statutorily adopted a best interest standard" in third-party custody disputes); Kaas, *Determining Detriment to the Child in Third–Party Custodian Cases in Connecticut,* 17 W. New Eng. L.Rev. 205, 206 n. 7 (1995) (stating that Hawai'i statutorily adopted the best interest of the child standard in HRS § 571–46).

**31.** The psychologist's evaluation described Mother as "defiant" and "in your face, frequently in trouble with rules and regulations" and "often an angry antisocial type[.]" The report also stated that Mother had a "[t]endency to impulsive and/or out[-]of[-]control behavior, [and] significant impairment in empathy."

**32.** At the trial, Mother's sister related one incident where another sister "couldn't stop [Child] from crying. And when [Mother] got off the phone [Mother] . . . went over to [Mother's other sister] and [Mother] started hitting [the other sister] and [Mother] pulled [the other sister's] hair, [and Mother] spit in [the other sister's] mouth."

**33.** In her opening brief, Mother cites the following testimony of her psychiatrist:

[MOTHER'S COUNSEL]: Is there anything about [Mother's] personality that would render her unfit to be a parent?
[PSYCHIATRIST]: No.
Q. Is there anything about her personality that would require the State to take her children away from her?
A. No.
Q. Is there any mental disorder that she's undergoing at this time that would cause the State to terminate parental rights?
A. No.

**34.** Mother points to the following testimony by a neighbor and family friend:

[MOTHER'S COUNSEL]: And—and so you've seen [Mother] interact with children?
[FRIEND]: Right.
Q. And you said you've seen this for hours at a time?
A. Right.
Q. Based on your own personal observation, [Friend], did you observe anything that would lead you to believe that [Mother] is not a fit parent?
A. Absolutely not.
In fact there is no—I sort of see myself as—you know, I'm very much a child advocate and I would be very concerned if there were any—anything that would be suggestive of that.
Q. Did you see [Mother] strike the children?
A. Never.
Actually, I look at the kids and the way they interact. The kids obviously feel comfortable with [Mother]. They turn to her, you know. They do normal kid things, try to push boundaries a little bit. I've seen her deal with them appropriately.

time of trial, Mother had been married for five months, and she and Husband had had another child. Mother had been undergoing treatment with her psychiatrist since July 1998, had "finished" at the Kapi'olani Community College, and completed an internship at Tripler Hospital as part of a graduation requirement. Mother argues that other than the "clearly biased testimony" of her sister, the only adverse evidence regarding her fitness was given by the doctors who contacted her only for testing purposes, and who did not meet with Husband or her other child.

■ Although its conclusions are freely reviewable, the family court "is given much leeway in its examination of reports concerning the child's care, custody and welfare, and its conclusion, if supported by the record and not clearly erroneous, must stand on appeal." *Woodruff v. Keale,* 64 Haw. 85, 99, 637 P.2d 760, 769, *reconsideration denied,* 64 Haw. 688 (1981). We conclude the reports and testimony provided by the court-appointed psychologist and psychiatrist, and the testimony of Child's aunt, are substantial evidence supporting the family court's order continuing Grandparents' guardianship status. In light of the extensive evidence presented, we believe the family court implicitly considered the statutory preference granted to parents in HRS § 571–46(1).[35]

### XI.

Mother also argues that the family court erred in denying her motion for unsupervised visitation and for a custody evaluation pursuant to HFCR Rule 16(b).[36] Although not expressly stated, she apparently challenges the following visitation findings and conclusions:

[Findings]

. . . .

> You know, I see it from my point of view it's a relatively normal relationship between parent and child.
> Q. Have you ever had to report her to Child Protective Services?
> A. Never.

35. In future cases, we believe it advisable that the family court expressly set forth its findings and conclusions on this issue.

8. *Mother offered no evidence or testimony demonstrating any change in circumstance, let alone material change in circumstance, since the trial of March 1, 1999,* in support [of] her request to change visitation to unsupervised status.

9. Testimony and evidence produced at the March 1, 1999 [trial] substantiated a continuing need for supervision of visitation as being in [Child's] best interests.

. . . .

[Conclusions]

1. *There has been no material change in circumstance warranting modification* of visitation from supervised to unsupervised status.

2. Change of visitation from supervised to unsupervised would be detrimental to the best interest of the child.

. . . .

(Emphases added.) She also contests the following custody evaluation findings and conclusions:

[Finding]

■ . . . .

14. Mother herein has offered no evidence or testimony demonstrating any change in circumstances, let alone any material change in circumstances, in support of her post-trial request for custody evaluation.

. . . .

[Conclusions]

. . . .

3. There has been no material change in circumstance warranting custody evaluation.

36. HFCR Rule 16(b) provides, in relevant part:

> *Social study.* In the event of any dispute relating to child custody or visitation, or whenever the court deems it advisable, the matter shall be referred to the appropriate branch or division of the family court for social study and report and the social study and report shall be completed before the trial or hearing on such dispute. . . .

4. *Subjecting [Child] to a custody evaluation at this time would not be in [Child's] best interests.*

(Emphasis added.) Findings of fact are reviewed under the clearly erroneous standard. *Cho Mark Oriental Food v. K & K. Int'l.*, 73 Haw. 509, 515, 836 P.2d 1057, 1061 (1992). "A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence to support the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (internal quotation marks and citations omitted). When conclusions of law involve both fact and law, we also review them under the clearly erroneous standard. *In re Doe*, 89 Hawai'i 477, 486–87, 974 P.2d 1067, 1076–77 (App.1998). Conclusions of law which involve only law are reviewed under the right/wrong standard. *Hirono v. Peabody*, 81 Hawai'i 230, 915 P.2d 704 (1996).

### A.

A person seeking a change in visitation must show a material change in circumstances since the previous visitation order. *Nadeau v. Nadeau*, 10 Haw.App. 111, 121, 861 P.2d 754, 759 (1993). At a November 25, 1998 hearing, the family court orally ordered that Mother would have visitation with Child at the PACT Visitation Center until the time of trial. This order is reflected in a February 1, 1999 written order which provided that "[p]ending trial, Mother shall have supervised visitation at the PACT Visitation Center with [Child]." Subsequently, on March 18, 1999, Mother filed her visitation/custody motion. The April 9, 1999 order denied Mother's motion, but did not state any reasons for the denial.

Since the February 1, 1999 order only outlined visitation pending trial, it appears the family court intended that a visitation plan would be established or confirmed after the trial. Although the March 31, 1999 order

following trial did not contain any visitation provisions, the visitation provisions of the February 1, 1999 order were reinstated in the April 9, 1999 order, which provided "for supervised visitation by Mother alone with [Child], all to occur at the PACT Visitation Center, with actual frequency and duration of visits to be controlled by [Child's] therapist[.]" Thus, the February 1, 1999 order was the "previous visitation order" from which Mother was required to show a material change in circumstances.

In visitation finding 8 and visitation conclusion 1, the family court determined that no change in circumstances existed. Further, in visitation finding 9, the family court found the need for continued supervision of visits by Mother was substantiated by the testimony and evidence, and in conclusion 2, determined such to be in Child's best interest.

The record does not indicate that Mother exercised her visitation privileges at the PACT Visitation Center after the trial. Rather, Husband testified that he and Mother had jointly decided not to exercise any visitation rights until Husband was also allowed to participate in the visits.[37] Husband is not Child's natural father.

Under the circumstances, we hold that visitation findings 8 and 9 were not clearly erroneous and visitation conclusions 1 and 2 were not wrong.

### B.

In regard to Mother's motion for a custody evaluation, we first note that a request under HFCR Rule 16(b) should be filed as a pre-trial motion, and Mother's motion was brought after the March 1, 1999 trial.[38] Notwithstanding this procedural error, we address the merits of Mother's argument.

The essence of Mother's request for a custody evaluation became moot once the trial was completed. The fundamental issue before the family court was whether the

---

**37.** Nothing in the record indicates that Husband ever filed a motion for visitation with Child.

**38.** Although Mother titles her motion as a request for a custody evaluation, HFCR Rule 16(b) is actually a request for a social study in disputes involving either custody or visitation. We note that Mother did not cite to HRS § 571–45 as a basis for her motion.

guardianship should be terminated; that is, whether Grandparents should retain custody of Child, or whether Mother should regain custody of Child. It is plain that the facts adduced and the issues addressed at trial are identical to the issues which would have been considered in a report pursuant to HFCR Rule 16(b). Under the circumstances, we conclude finding 14 was not clearly erroneous and conclusions 3 and 4 were not wrong.

## XII.

Mother additionally argues that if she is not entitled to have Child returned, then the family court should have removed her other child from her home. She also contends that because Grandparents did not challenge her assertion that Grandparents' guardianship was only for medical purposes and to allow Mother to attend school on the mainland, it must be taken as true. However, the instant case involves only Grandparents' continued guardianship over Child. Additionally, the purported reason for Grandparents seeking a guardianship was not a factor in determining, at the time of the hearing, either Mother's fitness or ability to provide a stable home, or in assessing the best interest of the child.

## XIII.

Accordingly, we affirm the March 31, 1999 order denying Mother's termination motion, and the April 9, 1999 order denying her visitation/custody motion.