JOURNAL ENTRY and OPINION
The issue in this case is whether an original shared parenting plan made a part of a divorce decree can continue when the mother has moved to New York and intends to teach and instruct the minor child in Orthodox Judaism over the father's objections. The trial court found that geography dictated a different plan and that on the subject of religious schooling, the parents had already agreed by court order that the child would receive a Jewish education. The court recognized that the only division was over the extent of the teaching. The father argues the court has wrongly shown a preference for Orthodox Judaism by its order and that he should be granted support and should be the sole determiner of the child's education and religious upbringing. He assigns the following errors for our review:
 I. THE TRIAL COURT ERRED BY ORDERING CHANGES TO THE SCHOOL SELECTION PROVISION OF THE PRIOR ORDER.
 II. THE TRIAL COURT ERRED BY IMPOSING A COMPANIONSHIP SCHEDULE THAT DEPRIVES THE FATHER OF THE OPPORTUNITY TO CELEBRATE ANY RELIGIOUS OR SECULAR HOLIDAYS WITH HIS CHILD.
 III. THE TRIAL COURT'S DECISION VIOLATES THE ESTABLISHMENT AND FREE EXERCISE CLAUSES OF THE UNITED STATES AND OHIO CONSTITUTIONS BY IMPERMISSIBLY INFRINGING ON THE FATHER'S CONSTITUTIONAL RIGHTS.
 IV. THE TRIAL COURT ERRED BY DEVIATING FROM THE CHILD SUPPORT GUIDELINES AND BY FAILING TO AWARD CHILD SUPPORT TO THE FATHER.
 V. THE TRIAL COURT ERRED WHEN IT MODIFIED THE SHARED PARENTING PLAN AFTER THE EVIDENCE DEMONSTRATED THAT THE PARTIES WERE UNABLE TO COOPERATE REGARDING THEIR CHILD.
Having reviewed the record and the legal arguments of the parties, we affirm the decision of the trial court in part and reverse and remand it in part. We reverse on assignment of error two as it relates to the unreasonableness of giving the mother all of the holidays and vacations. Consequently, we reverse and remand to reconsider that issue consistent with this opinion. The apposite facts follow.
Three years after his birth, Nathan Shore's parents divorced and agreed to shared parenting. Among other things, the shared parenting gave the father alternating weekends and holidays; two midweek evenings; two weeks during summer to increase as the child aged. The court ordered the father to pay $260 support. The parties agreed to restrict their residences to Cuyahoga, Lake, and Geauga Counties unless they agreed otherwise, or by court order. The parties also agreed that Nathan would receive a Jewish religious education and upbringing. However, they agreed to mutually agree on the extent of the Jewish education, upbringing and lifestyle. The shared parenting agreement was incorporated into the divorce decree.
On August 9, 1995, the father moved to change the shared parenting order and restrain the mother from moving Nathan to Brooklyn, New York where she planned to move. The court granted his restraining order. The court also appointed Janet Kronenberg as the child's lawyer and ordered various psychological evaluations.
Therefore, the mother filed a motion to relocate and for psychological evaluations. She permanently moved to New York on November 1995 and married Yonker Davidovics. After an eight day trial on various days in May and June 1996, the magistrate issued its order to continue the shared parenting, but to modify to take into account the geographical changes occasioned by the mother's move. The court also recognized that the mother's embrace of Orthodox Judaism had strained the ability of these two parents to find the common ground for Nathan's well being that they once shared without restraint. The court recognized that the father is admittedly opposed to Orthodox Judaism whereas the mother is an Orthodox Jew. This, the court recognized has made for a difficult situation.
Thus, the court granted the father primary possession of the child during the school year; however, the mother would continue to enjoy liberal weekend access if she chose to remain in the State of Ohio. If the mother did not remain in Ohio, the court would grant alternating weekends to the mother with primary consideration given to Nathan's school schedule. The court then ordered the mother possession during the holidays, vacations, and most of the summer. Additionally, the mother was allowed to select three schools that would provide Nathan with a Jewish religious education. The father was to select one out of the three. If he did not select one, the mother was to choose. The mother was held responsible for the tuition and related expenses. The father's child support order was terminated. Given the cost to the mother for Nathan to travel, and her responsibility for the cost of education, the mother was not ordered to pay child support. The other provisions of the shared parenting plan remained unchanged. On August 30, 1996, the parties agreed to enroll Nathan in Jewish Day Nursery, a conservative Jewish Day School in Beachwood, Ohio.
The father filed his objections to the Magistrate's Decision on January 20, 1998, having had a continuance granted. On October 26, 1998, the trial court sustained the father's objections in part and denied them in part. It adopted the Magistrate's Decision with some changes in the possession schedule and gave the father the right to claim Nathan on his income taxes. The father filed this appeal on November 24, 1998.
Before we address the assigned errors in this case, this court is greatly concerned that the magistrate's report was issued on June 12, 1997, and a final ruling was not made for over a year on October 26, 1998. The delay was largely due to the trial court's granting numerous continuances to the mother and the father. While this court cannot tell a trial court how to run its docket, we do want to note that this time period is unreasonable and without good justification.
Additionally, this court is mindful that the father believes that this case turns on a religious preference. However, we are not so persuaded. In fact, this case is more about geography than religion. We reach this conclusion because the decision to change the shared parenting agreement came as a result of the mother's move to New York. The issue over whether Nathan would receive a Jewish education had already been decided by the parties in the original divorce. Both parties agreed that he would receive a Jewish education. To have the mother recommend schools for Nathan is simply a continuation of what the parties had initially agreed to in the original divorce.
Both assigned errors one and three will be discussed together. The father argues that the trial court erred in changing the school selection provision under the prior order. He maintains that it was improper to permit the mother to select a Jewish religious school. His third assignment of error argues that the trial court's decision regarding Nathan's schooling infringes upon his constitutional rights under the Establishment and Free Exercise Clauses of the United States and Ohio Constitutions.
The order states:
 Prior to the commencement of the school year, mother shall provide father with the choice of three schools she would like Nathan to attend. Father shall have the option of selecting one of the three schools chosen by the mother. If father chooses not to exercise this option, then mother shall make the selection. The tuition and related educational expenses shall be paid by the mother.
 The parties further agree that the child shall have a Jewish religious education and upbringing, and that the parties shall consult one another and mutually agree upon the extent of such Jewish education, upbringing and lifestyle and other matters of similar importance affecting the child, whose well-being, education and development shall, at all times, be of paramount consideration to both father and mother. Father shall respect the right of mother, if requested, to allow the child to attend religious courses or schooling during the summer while in the possession of mother.
(Magistrate's Decision at 13.)
Nathan's father agreed to religious school training for Nathan in the original shared parenting agreement. The Ohio Supreme Court has reasoned that provisions that have been agreed upon by the parties in divorce agreements are enforceable by a court. Rand v. Rand (1985), 18 Ohio St.3d 356, 358. It chose not to treat one for the selection of a religious school differently. In Rand, a father agreed in a separation agreement, which was incorporated into the divorce decree, to pay for his son's religious school training. The Ohio Supreme Court stated:
 [A]ppellant herein agreed, of his own free will, to reimburse his wife for his son's religious education. Such a consensual agreement ordinarily does not fall within the ambit of the Establishment Clause of the federal or state Constitution. The language in Section 7, Article I
of the Ohio Constitution, that `[n]o person be compelled to support any place of worship * * * against his consent,' in part dispels appellant's argument. Moreover, appellant's averred rights would be counterbalanced by appellee's right to freely exercise her religion and her right, as the custodial parent, to formulate and implement the child's religious education.
Rand, Id., citing In Re Landis (1982), 5 Ohio App.3d 22.
The father argues that courts have ruled that a trial court cannot impose a parochial school requirement upon a residential parent. For this proposition, he cites Caner v. Caner (February 6, 1979), Franklin App. No. 78AP — 581, unreported. However, we believe Caner is easily distinguished from the case at bar. The parents in Caner had not made a provision in their original separation agreement for the religious training of the children. The court merely pointed out that the children's religious school training had not been dealt with and it could not order the children to receive religious training if the parents had not previously agreed to do so. Id. at 5 — 6. However, enforcing a prior agreement that a child will attend a religious school is within the trial court's discretion and therefore not in violation of the father's constitutional rights.
The Magistrate's Decision did not alter the type of school the parties selected in the original agreement. On the contrary, to order Nathan to attend public school would deviate from the original agreement. The Magistrate's Decision only modified the original agreement to the extent that the mother is given the right to select three religious schools from which the father may choose. The father cites no objections to the schools from which he was allowed to choose. In fact, both parents selected and enrolled Nathan in a conservative Jewish preschool in 1996.
The father argues the trial court failed to determine the modification was in Nathan's best interests. "[T]he discretion of the trial court is not unlimited, but is subject to reversal upon the basis of a showing of abuse of discretion." Baxter v. Baxter
(1971), 27 Ohio St.2d 168, 172 — 173. The law in Ohio is that a trial court abuses its discretion when it fails to consider the best interests of the child. Birch v. Birch (1984),11 Ohio St.3d 85, 87 — 88. A trial court is obligated to consider a number of factors when considering the best interests of a child. R.C. 3109.04 (F) (1) (C). These are:
 The child's interaction and interrelationship with his parents, siblings, and any other person who may significantly affect the child's best interests;
The child's adjustment to his home, school, and community;
 The mental and physical health of all persons involved in the situation.
Pater v. Pater (1992), 63 Ohio St.3d 393, 396. In the case sub judice, before delivering its order the trial court made these findings:
 Nathan interacts and relates with each of his parents very well.
* * *
 Both parents show an intense interest in Nathan's physical and spiritual upbringing.
 The Magistrate further finds both parents have appeared rigid and intolerant at times.
* * *
 The fact that one parent practices their faith to a stronger degree is not something that would adversely effect a minor child.
* * *
 The Magistrate further finds the parties had originally agreed that Nathan would have a Jewish religious education and upbringing, further providing that they would consult with one another and mutually agree upon the extent of such Jewish education. It is clear that Mrs. Davidovics would choose a very conservative or Orthodox Jewish day school, while Mr. Shore, although expressing a willingness to compromise, would more than likely select a public school.
(Magistrate's Decision at 4 — 7.) The magistrate also found that Nathan's grandparents from both families had developed strong ties with Nathan. Supra. However, the magistrate notes the maternal grandparents' feelings towards the mother caused them to fail to accurately portray the mother's parenting abilities when testifying. He found nothing to indicate that either parent suffered from any physical or mental inabilities that would inhibit their parenting. (Magistrate's Decision at 4-6.) It is clear that the magistrate carefully considered the factors required under R.C. 3190.04(F)(1)(C) when making his decision.
The father protests that the magistrate ignored the expert testimony, leading him to fail to fully consider Nathan's best interest. The father submits this testimony opposed Nathan attending a religious school. This is a blatantly incorrect assertion. None of the experts provided testimony directly related to the type of school Nathan should attend. In fact, much of this testimony indicates it is in Nathan's best interests to have contact with his mother's faith while in Cleveland. Actually, the testimony he cites relates to whether Nathan's primary residence should be in Cleveland or Brooklyn.
He first points to his expert's, Dr. Lawrence S. Waldman, concerns over Nathan's feeling "strained." He presents this testimony as concluding that Dr. Waldman testified a change would overburden Nathan, implying the "change" was related to school. However, this testimony was in response to inquiry regarding where Nathan should reside. It did not approach the issue of Nathan's schooling. (Tr. 660.)
Further, Dr. Waldman testified that the mother's faith was not an issue. He made this assessment based on his observations when he met with the parents individually and with Nathan. He also noted they' had successfully made compromises over Nathan's schooling, issues over food, day care, and the Sabbath in the past. He noted that they had been able to keep Nathan's best interests in mind. (Tr. 654-655.)
Dr. Michael Leach, the court appointed expert, also did not testify regarding Nathan's schooling. The father quotes Dr. Leach as stating "Nathan feels quite burdened emotionally and psychologically by the many transitions and uncertainties resulting from the divorce." Again, the father wrongly attributes an expert's comment to concern over Nathan going to an Orthodox school. In truth, this statement was related to the possible effects of Nathan's living in New York as opposed to living in Cleveland. Dr. Leach did not make any recommendations regarding where Nathan should go to school.
Dr. Mark Lovinger, the mother's expert, also did not provide a recommendation of the type of school Nathan should attend. His testimony indicated that he, like Dr. Waldman, had no concerns regarding the mother's Orthodox faith. Having been raised in a "very Orthodox home" his testimony in this regard was very credible. (Tr. 796.) Responding to the question "[b]oth based upon your knowledge of Flatbush yourself and from a psychological perspective, is [there] [sic] something that this court should be concerned with," he stated:
 There is nothing within Orthodox Judaism or traditional observance of Judaism that would in any way allow for the alienation of a father from a child. If the father is not Orthodox — or no matter what, if anything, there is a very clear teaching and understanding that tolerance and accepting of different ways of doing things are part of Judaism.
(Tr. 800-804.)
Dr. Lovinger's testimony provided a basis for the trial court to conclude that exposure to Orthodox Judaism would not inhibit Nathan's relationship with his father in any way. Further, he testified that the Orthodox faith discourages asserting religious influence over others. (Tr. 800-804.) This mirrors the testimony of Rabbi Chaim Weinfeld's testimony at his deposition. Nothing in the experts' testimony warrants the father's conclusion that going to an Orthodox or-conservative school would confuse or alienate Nathan. Nothing in their testimony indicates that Nathan's attending an Orthodox or conservative Jewish school would be against Nathan's best interests.
Further, it must be noted that the trial court did not give the mother the unilateral right to select Nathan's school. The provision's language clearly allows both parties a voice in the school selection, with the father having the option to make the final choice. It does not allow the mother to limit her choices to an Orthodox school. It does not articulate a preference for the mother's religion over the father's, or the father's over the mother's. The provision is not based on either parties' religious beliefs.
Instead, given that the trial court determined Nathan should reside with his father and go to school in Beachwood, Ohio, the magistrate's order ensures Nathan will be exposed to both practices on a daily basis. Dr. Lovinger testified that it is important to Nathan's best interests that the values of both parents be supported:
 Typically in cases like this when things are when [sic] there are court issues and each side is supposedly trying to win, sometimes one forgets to focus on what is in the best interest of the child. And I guess what I am looking for more, as I said earlier, is not how much is done for Nathan in the present home, because whether he is with his father or with his mother, that's very important and it's part of what a child needs, but what is more important is the acceptance and the promotion of the child's life with the ex-spouse. No matter what the feelings are between the husband and the ex — husband and ex — wife, that the acceptance and promotion of the lifestyle which the other spouse has, whether you agree with it or don't agree with it, needs to be promoted with the child, and my concern was that.
(Tr. 800-804.) In fact, all of the experts and the guardian ad litem stressed the importance of Nathan maintaining equal ties to both of his parents.
Attending a religious school ensures that Nathan will receive spiritual training. This supports his mother's lifestyle even when he is not with her. The magistrate stated: "As Dr. Leach suggested, this will allow Nathan to receive exposure to values of Orthodox Judaism, thus easing his transition between the households." (Magistrate's Decision at 7.) However, it does not encourage it over the father's. It merely allows Nathan a chance to be exposed to both views when he is in Cleveland. As most of his time will be spent in Cleveland, it is in his best interests to have a method of maintaining ties to his mother's faith. His living in his father's home assures a balance between the two sets of beliefs can be maintained. His father should assist Nathan in establishing a frame of reference to be used to sort out the different ideas. This is a common aspect of parenting for parents of all races, creeds, and religions.
Further, the father cites no actual conflict resulting from Nathan attending this school or any other religious school. He merely puts forward fears that problems may arise based on suspected, not actually known, differences between the Orthodox Jewish traditions and those traditions observed by himself and the members of Nathan's extended family. In fact, as is discussed above, two of the experts testified it was unlikely that the differences would harm Nathan.
It is also important to note that he does not allege that the mother selected strictly Orthodox schools. He fails to state how his life with his son or his own individual religious freedoms have been impacted, nonetheless encroached upon. He does not name what practices Nathan has participated in that are different or oppose his beliefs. He completely and totally fails to establish that he or Nathan have actually been harmed by Nathan's attending a religious school. The record contains competent, credible evidence upon which the trial court could base its decision that Nathan's best interests were served receiving a religious education. Nor did it abuse its discretion when it determined selecting a religious school did not threaten Nathan's interest in any way. Therefore, the father cannot demonstrate that the trial court abused its discretion in adopting the modification to the provision. His first and third assignments of error are overruled.
His second assignment of error has merit. The father avers that the trial court erred by imposing a companionship schedule that deprives him of the opportunity to celebrate any religious or secular holidays with Nathan. He asserts that the trial court abused its discretion when it failed to adopt his plan or the plan submitted by the guardian ad litem. The trial court adopted the plan submitted by the mother with some modifications. The provisions for the mother's possession read as follows:
 a. Thanksgiving vacation shall be from Wednesday after school concludes until Sunday at 8:00 p.m.
 b. Christmas/Hanukkah vacation shall be from the day after school concludes until the day prior to the school's resumption.
c. Winter and spring break as set forth in Paragraph (b).
 d. All breaks for Rosh Hashanah, Yom Kippur, Sukkoth, Purim, Pesach and Passover. If no extended break is scheduled during the school year, mother may exercise her companionship with Nathan in Cuyahoga County during these holiday periods.
 e. Her birthday and Nathan's birthday if during her extended possession period.
The father maintains that these provisions are not in the child's best interest and in violation of R.C. 3109.04 (D) (1) (c). This subsection requires the court, whenever possible, to ensure both parents "have frequent and continuing contact with the child, unless frequent and continuing contact with any parent would not be in the best interests of the child." A court has broad discretion in modifying parental rights and responsibilities. SeeDavis v. Flickinger (1997), 77 Ohio St.3d 415, 421. The judgment of the trial court cannot be reversed absent a showing of abuse of discretion. Miller v. Miller (1988), 37 Ohio St.3d 71, 75. If "the trial court's action is supported by a substantial amount of credible and competent evidence, the decision will not be reversed by a reviewing court" * * * Moore v. Moore
(March 27, 1988), Portage App. No. 97-P-0008, unreported. R.C. 3109.04
(F) (1) lists a number of factors to be considered to determine if the modification is in the best interests of a child. Among these is the "child's interaction and interrelationship with his parents, siblings, and any other person who may significantly affect the child's best interest." R.C. 3109.04 (F) (1) (c)
Under the parenting plan, Nathan will spend the majority of his time with his father. Outside of the time allocated above, during the school year Nathan will only spend alternating weekends with his mother. Courts place a great deal of importance on parents' right to visit with their children "[b]ecause of the importance of the parent — child relationship and the likely benefits to the child as it grows up * * *." Pettry v. Pettry (1984),20 Ohio App.3d 350, 352.
The trial court ruled that Nathan would reside with his father during the school year. The trial court's possession schedule ensures that Nathan spends some extended periods of time during the school year with "his mother. The magistrate indicated in his decision that this was his concern when he established the schedule. (Magistrate's Decision at 7.) However, that all of the holiday periods were given to the mother does impede on the father's ability to share religious holidays and traditions with his son. In doing so, it infringes on the father's ability to practice his religion and teach Nathan those traditions. Nathan will learn his mother's religious practices, but little of his father's. The whole tenor of the proceedings regarding the parents' differing religious practices demanded that measures be taken to guarantee both parents' religious ideas are recognized and protected. The trial court failed to take this into consideration. A court cannot issue an order which promotes one faith over the other. See, Pater v. Pater (1992), 63 Ohio St.3d 393,397, Birch v. Birch (1984), 11 Ohio St.3d 85, 86, citingReynolds v. United States (1878), 98 U.S. 145, 164.
This schedule also means that Nathan will be separated from his extended family members in Cleveland during the holidays, unless they travel to New York. Maintaining close family ties with extended family members has been determined to be in a child's best interest. See Hammons v. Hammons (May 4, 1994), Gallia App. No. 93CA24, unreported. These ties are one of the factors to be considered under R.C. 3109.04 (F)(1)(C). Pater at 396. In his decision, the magistrate made findings that Nathan had developed a significant relationship with his maternal grandparents. (Magistrate's Decision at 4.) He also made findings regarding the poor relationship between the mother and her parents. (Magistrate's Decision at 4, 6.) Extensive testimony was heard from members of both sides of the family regarding the strain on the relationship. The experts testified to the value of encouraging the relationship between the grandparents and Nathan to continue and to the mother's continuing desire to distance herself from her family. Given the mother's poor relationship with her parents and with no indication that she is likely to attempt to reconcile this, it is unlikely they will venture to New York to celebrate holidays.
With these considerations in mind, it is hard to understand how the trial court could have ordered the questioned provisions of the possession schedule. The father's plan provides a more equitable distribution of holiday time. It also ensures the mother spends periods of extended time with Nathan during the school year. It distributes the various yearly holidays so that each year the New York and the Cleveland families have holiday time with Nathan. The record does not contain competent, credible evidence which supports concluding that the adopted schedule is in Nathan's best interests. We find the trial court abused its discretion by adopting a possession schedule that failed to take into consideration the "father's and the other family members' right to spend time with Nathan, and the benefit he would receive therefrom.
It was also an abuse of discretion for the trial court to adopt a schedule which effectively denies the father opportunities to pass on his religious traditions to Nathan in equal measure to those given the mother. Nothing in the record demonstrates Nathan would suffer any harm as a result of this exposure.
The father also complains that "it is unfair for Nathan to be required to travel to and from New York by plane so often. The possession schedule requires Nathan to travel to New York on alternating weekends every month. The father does not specify how Nathan's travel impacts the factors which a court must consider in determining a child's best interest. He states that Nathan misses a lot of school; but, he does not specify how much or offer evidence that it has harmed Nathan's performance. There is some expert testimony that the traveling back and forth may have been causing Nathan some confusion. However, this testimony was taken at a time when the parents had not been divorced long. The experts attributed Nathan's confusion to the changes brought on by the divorce in general. Also, at that time, he was staying in New York for longer periods of time. He traveled every two weeks and stayed for two weeks every month. The schedule has since been changed. His time is not as evenly distributed between the two cities as he does not stay as long on each visit. Nathan travels to New York every "other weekend from after school on Friday until Sunday at 8:00 p.m. Further, the testimony was taken three years ago in 1996. Nathan is older and has had more time to adjust to his parents' divorce. Without a showing that the traveling is causing Nathan to suffer in some way, this court cannot find the trial court abused its discretion. The second assignment of error is affirmed in part and reversed in part.
The father's fourth assignment of error states the trial court erred by deviating from the child support guidelines and by failing to award child support to the father. R.C. 3113.215 (B) (6) regulates child support guidelines where there is a shared parenting agreement:
 If the court issues a shared parenting order in accordance with section 3109.04 of the Revised Code, the court shall order an amount of child support to be paid under the child support order that is calculated in accordance with the schedule and with the worksheet set forth in division (E) of this section, through line 24, except that, if the application of the schedule and the worksheet, through line 24, would be unjust or inappropriate to the children or either parent and would not be in the best interest of the child because of the extraordinary circumstances of the parents or because of any other factors or criteria set forth in division (B) (3) of this section, the court may deviate from the amount of child support that would be ordered in accordance with the schedule and worksheet
* * *
(Emphasis added.)
Under subsection (B) (3) of this section, the court may consider the extraordinary costs associated with visitation and the need and capacity of the child for an education. Further, "[i]n domestic relations actions, however, the trial court must have broad discretion to fashion a decree that is equitable based on the facts and circumstances of each case." Eickelberger v.Eickelberger (1994), 93 Ohio App.3d 221, 225, citing Kunkle v.Kunkle (1990), 51 Ohio St.3d 64. Deviations from the statutory guidelines must be supported by findings of fact. In Re Krechting
(1996), 108 Ohio App.3d 435, 437, citing Marker v. Grimm (1992),65 Ohio St.3d 139, 142. In the case sub judice the magistrate made a finding that "the mother has established a residence outside the state."
(Magistrate's Decision at 5.) He further found:
 Regardless of where Nathan permanently resides, he will spend significant periods of time with the other parent. Airline travel makes this child accessible to both parents in little more than one hour. Both parents can continue to maintain their significant roles in Nathan's education and upbringing.
Id. at 7. He went on to find that the amount of Basic Child Support that would be ordered would be $368.89 per month.
Finding that it would be "unjust, inappropriate, and not in the best interest" of Nathan, he found it was necessary to deviate from the use of the schedules. Id. at B. He explained that the necessity for the deviation was caused by the enormous travel expense in the amount of $250 per month that the mother was required to pay. He found that it was preferable that her contribution to Nathan's maintenance was used in this manner. He also considered the cost she would incur as a result of her responsibility for Nathan's educational expense. Id. The combined costs of these expenses could easily equal or exceed the amount awarded under the Child Support Guidelines.
The Magistrate's Decision provides a plan that results in an actual sharing of expenses by the parties. The father will primarily be the main financial support for Nathan. He will be carrying the cost of the majority of Nathan's food, clothing, and shelter. However, the mother will be providing this over large portions of time as well. That she is paying his tuition and for his travel expenses during the entire year is significant. A court of appeals did not find an abuse of discretion when a trial court ordered that a mother did not have to pay child support even though she only had her children with her during the summer. The court stated:
 Because the parties incur fixed costs in maintaining suitable housing for the children year round, the total amount the parties spend supporting the children exceeds the amount called for under the basic guidelines.
Eickelberger v. Eickelberger (1994), 93 Ohio App.3d 221, 225. As Eickelberger points out, "[s]haring actual expenses provides for a more accurate division of child support than payment of a predetermined amount pursuant to the guidelines." Id.
The father further argues that the cost of travel for visitation is contemplated within the child support guidelines. He cites Tolle v. Tolle (August 15, 1991), Montgomery App. No. 12455, unreported for this rule. Tolle does not contemplate the type of extraordinary travel expenses involved in this case. The father in Tolle was traveling by car from one city to another within the same state. Id. at 5. In this case, the mother is paying for airfare.
In fact, Tolle recognizes that R.C. 3115.215 (B) (3) (d) allows a deviation from the scheduled amount when these level of costs are involved. Id. As there was competent, credible evidence supporting the trial court's decision not to require the mother to pay child support, we find no abuse of discretion. The fourth assignment of error is overruled.
The father's fifth assignment cites error as the trial court modified the Shared Parenting Plan instead of appointing the father the residential parent. It is also without merit. The father argues that the evidence demonstrated that the parents could not cooperate with one another. He contends that this rendered the Shared Parenting Plan inappropriate. R.C. 3109.04
(F) (2) requires the court to make a number of findings before ordering a shared parenting plan. The plan must be in the best interest of the child; the parents must be able to cooperate with one another; the parents must have an ability to encourage a loving and respectful relationship between the other parent and the child; there is no history of child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent; the geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting; the recommendation of the guardian ad litem of the child. The Magistrate's Decision specifically addresses all of these issues and makes a finding that a Shared Parenting Plan is in Nathan's best interests. It states, in part, "the visitation experiences of the parents and the child prior to trial indicate a capability of honoring and facilitating Court approved companionship rights. * * * Each parent has generally encouraged love, affection and contact between the child and the other parent." (Magistrate's Decision at 5.) Contrary to the father's assertions, an overwhelming amount of testimony from the experts, the step-father, and the mother, indicated that the parents, once the court battles were over, would be able to work together for Nathan's best interests. These opinions were based on interviews with both parents by the experts and their interviews with Nathan. The trial court relied on competent, credible evidence when it determined continuing a Shared Parenting Plan would be in Nathan's best interests. The fifth assignment of error is overruled.
This case is affirmed in apart and reversed in part. It is remanded to the trial court for proceedings in accordance with this judgment.
This cause is affirmed in part, reversed in part, and remanded.
It is ordered that appellant and appellee share the costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas, Domestic Relations Division, to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MICHAEL J. CORRIGAN, J., CONCURS.
 TERRENCE O'DONNELL, P.J., DISSENTS.(SEE ATTACHED DISSENTING OPINION.)
 _________________________ PATRICIA ANN BLACKMON JUDGE