FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

**Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000816
30-APR-2014
08:36 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---oOo---

SAMENA ALIYA HOLLOWAY, nka SAMENA ALIYA NORDKVIST,
Plaintiff-Appellee,
v.
JOSHUA DAVID HOLLAWAY, Defendant-Appellant

NO. CAAP-12-0000816

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-D NO. 04-1-3511)

APRIL 30, 2014

FUJISE, PRESIDING JUDGE, LEONARD AND REIFURTH, JJ.

OPINION OF THE COURT BY REIFURTH, J.

Defendant-Appellant Joshua David Hollaway ("Father")
appeals from the Order Re: Plaintiff's Motion for Post-Decree
Relief Filed June 6, 2011, ("Custody Modification Order") entered
on September 12, 2012, in the Family Court of the First Circuit
("Family Court"),[1] which modified the original joint custody
arrangement between Father and Samena Aliya Hollaway, nka Samena
Aliya Nordkvist ("Mother") by giving Mother sole custody
regarding educational decisions made on behalf of their son

---

[1]     The Honorable Paul T. Murakami presided.

("Son"). Specifically, Father challenges certain findings of fact ("FOF") and conclusions of law ("COL") in the Family Court's Findings of Fact and Conclusions of Law filed on November 15, 2012 ("FOF/COL").[2/] We vacate the Custody Modification Order and associated FOF and COL for lack of substantial evidence in support of the Family Court's key findings.

I.    BACKGROUND

Father and Mother (collectively, "Parents") were divorced on December 16, 2004, pursuant to a Divorce Decree. The Divorce Decree established that Parents would share joint legal and physical custody of Son. It did not specify how future decisions would be made on behalf of Son, or how Parents should proceed if they were unable to jointly make such decisions.

Parents originally enrolled Son in Palisades Elementary School ("Palisades") which he attended from kindergarten through sixth grade. If not enrolled in a private school, Son would normally next attend Highlands Intermediate School ("Highlands").

Mother, however, preferred to enroll Son in a private school, eventually focusing on Kamehameha Schools ("Kamehameha"). Father, an atheist, objected to Son's enrollment in any non-secular school, and to Kamehameha in particular, contending that it is a Christian school. The school's purported religious aspect does not form a basis for Mother's preference. Father also objected to Kamehameha on grounds that it maintains a "racially selective admissions policy," preferring those of Hawaiian ancestry.

Parents found themselves at an impasse. Mother filed her Motion and Affidavit for Post-Decree Relief, in which she sought an order directing Father to cooperate with her efforts to enroll Son at Kamehameha.

---

[2/]    FOF and COL filed after the notice of appeal has been filed are eligible for review on appeal. *See Mark v. Mark*, 9 Haw. App. 184, 193, 828 P.2d 1291, 1296 (1992) (post notice of appeal FOF and COL "bolster the earlier written orders and decrees of the court for purposes of withstanding appellate review"); *see also Inoue v. Inoue*, 118 Hawai'i 86, 92-94, 185 P.3d 834, 840-42 (App. 2008) (ruling on the merits of challenges to FOF and COL issued after the notice of appeal).

On September 20, 2011, at the hearing on Mother's motion, the parties presented the following testimony relevant to the merits of each school option.[3/]

DIRECT EXAMINATION [of Mother]

Q [by Mother's counsel] What's your experience with [Kamehameha]?

A     [M]y brother attended [Kamehameha]. And he would always talk about the resources they had, the field trips that he went on, the college prep that he received.

. . . .

A     Kamehameha I think is one of the best schools on this island. There is a cultural relationship to our family. [Son] is Hawaiian. He's also a very intelligent child who I think would benefit from the resources at Kamehameha.

. . . .

Q     Okay. What about the academics? I mean, going to right now, is [Son] being challenged at Palisades right now or how is he handling the work?

A     I don't feel that he is being challenged. He has skipped a grade. . . . [H]e often complains to me that he has to do work that's harder than the other kids, it's not fair.

They have a reading program at school where he has to read either a bigger book or a harder book than the other kids because he is so advanced.

I don't really feel that he's being challenged. He just flies through his homework and I would . . . like for it to be a little bit challenging for him.

Q     Okay. And you feel that Kamehameha would be some possible advan --

A     Yes.

Q     -- advantage to him in that department?

A     Yes. I feel that the curriculum there is at a higher standard.

. . . .

CROSS EXAMINATION [of Mother]

. . . .

---

[3/]     Son testified at the beginning of the hearing. He stated, "I kind of don't care what school I go to, but I just prefer to stay with my friends." It appears that most of his friends would remain in public schools, while his best friend may attend Kamehameha.

Q [by Father's counsel] . . . I think you had indicated that in your view [Kamehameha's] curriculum would be superior to the curriculum of the school he's attending now?

A     That's correct.

Q     What do you base that on?  What is [Kamehameha's] curriculum?

A     I base it on friends and family that has went there and a comparison to the math level that my brother was in while he was there and he's younger than me.  It was much higher and accelerated than the level of math that I was in.  And I'm . . . not a poor student.  I was considered above average in my class in GPA.

          .  .  .  .

A     . . . They also have an extensive band.  [Son's] very interested in music.  And he likes computers.  To put together like little movies and slide show.  They have a program over there for that.  I just thought that would be interesting for him.

Q     Have you ever heard of the Pearl City High School marching band?

A     I was in that.

Q     Have you heard of the Mililani High School marching band?

A     Yes.

Q     Those schools also have large bands[,] correct?

A     Yes.

Q     All right.  I wanna ask you though, if you can be a little more specific about -- is your opinion about the relative curriculums of [Kamehameha] and some public school based solely on the fact that your brother, you perceived him to have harder math than you?  Is that the data base that you're relying on?

A     No, not the only -- not the only thing.

          .  .  .  .

Q     Tell me any facts that you're aware of on which you base your opinion that [Kamehameha] has a superior curriculum?

A     Okay.  I base the fact that every year they have colleges that go in, big -- you know, reputable colleges like MIT. They go in there and prep the kids to either apply for these or recruit them to apply for their colleges.  They . . . win a lot of awards.  Their band is great.  Their -- they have math, um -- a math achievement -- I mean, those are the things that I base it on.

Q     Okay.  Would you agree with me that your son would excel at any school?  That he has the --

A     Yes, I believe he's --

Q       -- intellectual horse power?

A       Yeah, I believe he's very smart, yes.

. . . .

DIRECT EXAMINATION [of Father]

Q [by Father's counsel] . . . What is your perception as to why [Son] would like to be at Highlands Intermediate?

A       . . . [Highlands has] a strong robotics program . . . that has made the national finals the last two years.

Q       Okay.  Has your son participated in robotics and been successful in robotics competitions at Palisades?

A       Yeah, they're a championship team.  They're one of the top teams.

. . . .

Q       What kinds of things does your son learn in robotics that might help him or give him new interest as he goes through high school and into life?

A       They . . . learn a lot of mathematics.  They also learn how to solve problems logically.  They learn planning and team work.

And every one of the competitions also has a -- beside the actual robotics course that they have to run, they have a research and presentation, like sort of a problem solving thing where they take the issue of the day, a timely issue, and they put together a -- a solution for it, they write an essay, they make a display, and they present it to judges without any adult supervision.

That's the . . . actual component that his team is the strongest at.

. . . .

Q       . . . .

What is your opinion as to the curriculum or the amount of challenge and education that your son can get in the public school system?

A       Um -- I work in a public school and I think that . . . when you're teaching, which is what I do, . . . you know, I'm still learning and I think everybody's always still learning when you're teaching.

But there's no magic system and . . . Kamehameha's staff and faculty, they don't know a better system of teaching.  They don't have a better series of books, they don't have a better method.

They teach the same way that the rest of us do and they learned it in the same way the rest of us do. . . .

. . . .

. . . [Y]ou know, there may be some perceived benefits at Kamehameha, but . . . I personally don't see any evidence that the actual academic instruction is better. . . .

. . . .

<u>EXAMINATION [of Father]</u>

BY THE COURT:

Q      . . . .

. . . In your mind what constitutes a need for private school?

A      [Articulating religion and undesirable influences at another school as reasons.]

And a lot send their kids to private school because they think they might need a certain classroom sizes [sic] or special instruction or certain activities that they don't have access to at public school.

So far we haven't identified any of those things.  My son's happy with his programs he has. . . .

. . . .

I think that's sort of the implication in this whole mess is that somehow by not going to a private school he's going to be disserviced in some way, and I think that's a ridiculous implication.

. . . .

Q      By extrapolation then, would I be correct in concluding that in [Son's] case you don't perceive a need for private school?

A      I don't perceive a need for private school, no.

And I . . . don't say that there aren't perceived benefits to someone else, and we might debate about the quality of those benefits.

She might think that they have a better curriculum.  I might say otherwise. I don't necessarily think that there is a measurable difference there.

But what I do see and there are very strong negative aspects to me about -- things that oppose my core values. And -- and without something that at least pretends to somehow provide some benefit to balance out that offense to my core values as a parent, well then, . . . is this vague and non-specific benefit of [Kamehameha] that powerful that it should dismiss my . . . actual beliefs?

It -- maybe to say there's no need for private school, I -- I wouldn't want that to sound like I'm saying there's no benefit of it, or that there's no difference.  I don't think that that's true, that there's no difference.  But I don't perceive that there are benefits that outweigh my objections.

Both parents submitted exhibits that were stipulated into evidence.  Mother's exhibits included information pertaining to Kamehameha's admissions policies, excerpts from Kamehameha's 2011-2012 Student & Parent Handbook, and an excerpt from its

2011-2012 Catalog of Courses pertaining to Grades 7-8. These provided some insight into opportunities available at Kamehameha, such as which electives would be offered and Kamehameha's team-oriented approach. Father's exhibits included information pertaining to Son's performance at Palisades. Neither party's exhibits provided any insight into opportunities that would, or would not, be available to Son at Highlands or any other public intermediate school.

Father also provided testimony and exhibits regarding Kamehameha's religious affiliation and practices, including a Christian Education course and chapel service, and its "racial[ly] exclusive policy" that limits enrollment to those of Hawaiian ancestry.

On September 29, 2011, the Family Court issued an oral ruling, granting custody to Mother to make educational decisions for Son. At the end of that hearing, the court stated: "Because the opportunities available to a child, any child, in a private school setting, they've got the resources where a lot of public schools don't. That's a sad fact, but a fact it is."

On September 12, 2012, the Family Court issued the Custody Modification Order, reflecting its earlier oral ruling. On November 15, 2012, after Father filed his Notice of Appeal, the Family Court issued the FOF/COL, in which it stated:

### FINDINGS OF FACT

. . . .

7. A private school may give [Son] options[] that public school may not.

8. In weighing between the two parties, Mother is the party who would more likely offer more opportunities and options for [Son's] education.

### CONCLUSIONS OF LAW

1. . . . Modification of custody orders issued in divorce is provided for under Haw. Rev. Stat. section 580-11.

2. Based upon the best interests of the children standard, the parties shall continue to share legal custody of the child, with exception however, as to educational decisions, wherein Plaintiff/Mother is awarded the primary authority to make such decisions.

3. Mother's authority regarding educational decisions shall include the ability to have the parties'

child apply and enroll in private school, as well as the choice of private school.

Father timely appealed and filed his opening brief. Mother filed no answering brief.[4]

## II.  POINTS OF ERROR

Father contends that the Family Court erred by (1) "awarding Mother sole and primary authority to make educational decisions for [Son], including enrolling him in a private school of her choosing"; (2) "authorizing Mother to enroll [Son] in a religious and racially exclusive private school over Father's objections where both parents had joint legal custody of [Son], and continued public school enrollment was not detrimental to [Son]"; and (3) issuing FOF 7 and 8 and COL 1, 2, and 3.

## III. STANDARDS OF REVIEW

"We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case. Thus, we review questions of constitutional law under the right/wrong standard." *State v. Fields*, 115 Hawaiʻi 503, 511, 168 P.3d 955, 963 (2007) (internal quotation marks, citation, and ellipsis omitted).

"A trial court's FOFs are subject to the clearly erroneous standard of review." *Ueoka v. Szymanski*, 107 Hawaiʻi 386, 393, 114 P.3d 892, 899 (2005) (citations omitted).

An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed. An FOF is also clearly erroneous when the record lacks substantial evidence to support the finding. We have defined substantial evidence as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*Bremer v. Weeks*, 104 Hawaiʻi 43, 51, 85 P.3d 150, 158 (2004) (quoting *Beneficial Hawaiʻi, Inc. v. Kida*, 96 Hawaiʻi 289, 305, 30 P.3d 895, 911 (2001)).

The appellate court reviews the trial court's COLs de novo. A COL is not binding upon an appellate court and is freely reviewable for its correctness. Moreover, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned.

---

[4]     The record does not reflect where Son is currently enrolled in school.

> *Bhakta v. County of Maui*, 109 Hawai'i 198, 208, 124 P.3d
> 943, 953 (2005) (internal quotation marks, citations, and
> brackets in original omitted).
>
> > Generally, the family court possesses wide
> > discretion in making its decisions and those decisions
> > will not be set aside unless there is a manifest abuse
> > of discretion. Thus, we will not disturb the family
> > court's decisions on appeal unless the family court
> > disregarded rules or principles of law or practice to
> > the substantial detriment of a party litigant and its
> > decision clearly exceeded the bounds of reason.
>
> *Fisher v. Fisher*, 111 Hawai'i 41, 46, 137 P.3d 355, 360
> (2006) (quoting *In re Doe*, 95 Hawai'i 183, 189-90, 20 P.3d
> 616, 622-23 (2001)).

*Doe v. Doe*, 120 Hawai'i 149, 165, 202 P.3d 610, 626 (App. 2009)
(brackets omitted).

IV.  DISCUSSION

A.  While the Family Court did not make a finding that
there had been a material change in circumstances to
justify modification of custody, the parents' impasse
sufficed.

In arguing that COL 1 is incorrect, Father contends
that the Family Court abused it discretion in modifying the
parties' existing joint legal custody order and improperly
granted a change in custody because it did not first find that
there had been a material change in circumstances to warrant
modification of the original divorce decree. He notes that this
court has previously held that "[t]o obtain the family court's
change of a custody order, the movant 'must show a material
change of circumstances since the previous custody order, and
must show that such a change of custody is in the best interest
of the child.'" *Egger v. Egger*, 112 Hawai'i 312, 318, 145 P.3d
855, 861 (App. 2006) (quoting *Nadeau v. Nadeau*, 10 Haw. App. 111,
121, 861 P.2d 754, 759 (1993)). This court, however, has not
applied this threshold requirement in a joint custody context
where the court is asked to intervene regarding only a specific
aspect of custody.

The Family Court specified Hawaii Revised Statutes
("HRS") §§ 571-46 and 580-11 as the basis of its authority to
modify the custody order. HRS § 580-11 states that "[t]he court
may revise and amend the orders [issued during the pendency of

9

any action for divorce] from time to time." HAW. REV. STAT.
§ 580-11 (2006). HRS § 571-46(6) provides that "[a]ny custody
award shall be subject to modification or change whenever the
best interests of the child require or justify the modification
or change[.]" HAW. REV. STAT. § 571-46(6) (Supp. 2013). In
addition, because this case involves the modification of an order
awarding joint custody of a child, we note that HRS § 571-46.1(c)
specifies that "[a]ny order for joint custody may be modified or
terminated upon the petition of one or both parents or on the
court's own motion if it is shown that the best interests of the
child require modification or termination of the order." HAW.
REV. STAT. § 571-46.1(c) (2006).

While the statutory language above grants family courts
the jurisdiction to modify a joint custody order, our case law
requires that the party seeking modification must first make a
threshold showing of material change in circumstances.[5] In
*Nadeau*, for instance, we held that a threshold showing of
material change in circumstances applied to custody and
visitation modification orders, citing HRS § 571-46 and cases
concerning child and spousal support. 10 Haw. App. at 121, 861
P.2d at 759. Since this court has applied that requirement to
HRS § 571-46, it would be inconsistent to not apply it to its
sister statute, HRS § 571-46.1. Whether a substantial and
material change has been presented is reviewed under the
right/wrong standard. *Davis v. Davis*, 3 Haw. App. 501, 506, 653
P.2d 1167, 1171 (1982).

Other jurisdictions have recognized their courts'
authority to resolve a deadlock between joint custodial parents
regarding important matters such as choice of school. In *Morgan
v. Morgan*, for example, an Alabama appellate court cited several
other jurisdictions in recognizing that "[a]lthough no Alabama
case has heretofore declared that a circuit court may resolve a

---

[5] Such a policy reflects the importance of the family courts' focus
on the best interests of the child in evaluating proposed custodial
modifications, including modifications to educational decision-making. The
prior custody order, founded as it must be on the child's best interests, and
including, among others, the implicit component factors of stability and
security, should not be overturned lightly.

schooling dispute among divorced parents sharing joint legal custody of a child, other states have uniformly recognized that a court invested with jurisdiction over custody issues may do so." See 964 So. 2d 24, 31 (Ala. Civ. App. 2007). It went on to hold that "a court with subject-matter jurisdiction over custody issues has the inherent authority to resolve any educational dispute between divorced custodial parents who have equal constitutional rights concerning the education of their child." Id. Nevertheless, it proceeded to consider whether the parent seeking a change in custody had demonstrated a material change in circumstances, concluding that because, in part, "the parents [were] no longer able to agree on the child's education[,]" the court was authorized to modify custody. Id. at 34. In a Virginia case addressing an analogous issue, see Grzyb v. Grzyb, 79 Va. Cir. 93 (2009), that court stated that it "ha[d] no difficulty finding that a material change in circumstances exist [sic] in that the parties have reached a complete impasse on whether to give the child routine immunizations[.]" Id. at *1.

We find the aforementioned rationale persuasive and recognize that where joint custodial parents are deadlocked regarding an important decision implicating their child's future or welfare, such an impasse qualifies as a material change in circumstances sufficient to warrant the Family Court's consideration of a change in the custody order's terms with respect to the deadlocked matter. This assumes, of course, that a means of resolving such impasses is not addressed in the divorce decree; where not so addressed, the implicit assumption is that parents will be capable of reaching mutual decisions regarding their child.[6] As to this issue in this case, that

---

[6] We note that in cases where joint custodial parents reach an impasse in decision-making regarding their child, a number of preliminary alternatives are available, such as mediation, the Kids First program, parenting counseling, and development of a parenting plan. The family courts should consider these options first, as the process might lead both to a better-informed resolution of the immediate issue as well as a means for the parents to develop the co-parenting skills that will best serve the child.

HRS § 571-46.5(a), for example, provides that "[f]or every action that includes a contested custody of children, both parties or both parents shall develop either a mutually agreed-upon general parenting plan or separate individually-desired parenting plan, and file the plan at the outset of the

does not appear possible. Moreover, to not recognize this as a changed circumstance (or to not recognize it as an exception to this court's material-change-in-circumstances doctrine) would prevent the family court from stepping in to act in the best interests of the child where it is both specifically authorized by statute to do so and potentially of great import for the child's well-being. Therefore, the Family Court did not abuse its discretion in issuing the Custody Modification Order, nor did it err by implicitly concluding that the parties' impasse with regard to the schooling of their son presented it with a material change in circumstances. In sum, the court did not err in entering COL 1.

      B.     The record lacks substantial evidence to support the Family Court's finding that Kamehameha offered Son better options than public school.

Father contends that there is no substantial evidence in the record to support the Family Court's findings that "[a] private school may give [Son] options[] that public school may not" and that "Mother is the party who would more likely offer more opportunities and options for [Son's] education." We agree that the record lacks such evidence and, therefore, vacate the Custody Modification Order and the FOF/COL, both in part.

While Mother presented some evidence regarding options and opportunities at Kamehameha, the only evidence she presented regarding such options and opportunities relative to Highlands, or public school generally, consisted of her unsubstantiated opinion. She opined that Kamehameha's curriculum, relative to that of Palisades, or perhaps public school generally, "is at a

---

action. HAW. REV. STAT. § 571-46.5(a) (2006). If the parties cannot agree on a parenting plan, HRS § 571-46.5(d) authorizes the court to: "(1) Order the parties to participate in alternative dispute resolution and in counseling with a person with professional experience in child custody or parenting issues, or with other appropriate education, unless there is a finding of family violence; and (2) Develop and file a detailed parenting plan when requested by either of the parties or parents." HAW. REV. STAT. § 571-46.5(d).

     Where necessary, the family court may appoint a guardian ad litem as authorized by HRS § 571-46(a)(8), which provides that "[t]he court may appoint a guardian ad litem to represent the interests of the child" in any proceeding "where there is at issue a dispute as to the custody of a minor child[.]" HAW. REV. STAT. § 571-46(a)(8) (Supp. 2013).

higher standard." Her observation that Son was not being challenged at Palisades was contradictory and did not explain how Son would be more challenged at Kamehameha than at Highlands.

On cross-examination, Mother's explanation for believing that Kamehameha had a superior curriculum consisted of, in part, a vague reference to "friends and family" and anecdotal information regarding her brother's math aptitude relative to hers. The rest of her explanation emphasized Kamehameha's college recruiting, band, and math performance, but without any evidence indicating that these aspects were superior to those of any other schools, nor of Highlands in particular.

In sum, self-serving, vague, and unsubstantiated opinion evidence of a school's relative merits and anecdotal evidence of two students' relative performance in one academic subject is not substantial evidence on which a court may properly find that one school is superior, or in some way better suited for a particular student, than another. *Cf. Korsak v. Haw. Permanente Med. Grp.*, 94 Hawai'i 297, 308, 12 P.3d 1238, 1249 (2000) ("[G]eneralized medical opinions do not constitute substantial evidence." (citing *Akamine v. Haw. Packing & Crating Co.*, 53 Haw. 406, 410, 495 P.2d 1164, 1167-68 (1972))); *Seyler v. Seyler*, 201 S.W.3d 57, 65 (Mo. Ct. App. 2006) (reversing where "Husband presented no evidence that attendance at the high school division of the Catholic School met an educational need of Child based on Child's attendance at the elementary division"). The Family Court assumed, without evidentiary support as to the specific schools in question, that private schools necessarily provide "superior" education to public schools. Consequently, we conclude that FOF 7 and FOF 8 lack substantial evidence in support and, thus, are clearly erroneous. Because FOF 7 and FOF 8 form the basis for the conclusions reflected in COL 2 and COL 3, those conclusions are incorrect.[7/]

---

[7/] Our ruling does not mean that FOF 7 and FOF 8 could not be supported by substantial evidence, only that in this case, to this point, the record reflects no such evidence.

C.    The Family Court did not violate Father's constitutional parenting rights by making its decision based on Son's best interests.

Father contends that the Family Court erred by denying him his rights to raise his child with respect to religious beliefs and other principles. He argues that these rights are constitutionally-protected and that it was an abuse of discretion to disregard these rights absent any evidence showing that Kamehameha offered some benefit to Son that might properly offset any derogation of his rights.

Parents have a federal and state constitutionally-protected liberty interest in "the right . . . to direct the upbringing of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see In re Doe*, 99 Hawai'i 522, 533, 57 P.3d 447, 458 (2002) ("We affirm, independent of the federal constitution, that parents have a substantive liberty interest in the care, custody, and control of their children protected by the due process clause of article 1, section 5 of the Hawai'i Constitution."). There is, however, no infringement on such rights when a court, properly interposed between two parents, each equally vested with such rights, resolves an impasse between them regarding the exercise of those rights. *See, e.g.*, *Morgan*, 964 So. 2d at 31 (recognizing that under Alabama law, a court may apply the best-interests standard in a custody dispute between parents having joint custody without implicating the Fourteenth Amendment due process rights of either parent); *Jordan v. Rea*, 212 P.3d 919, 927 (Ariz. Ct. App. 2009) (noting that both parents have a constitutionally guaranteed right to participate in the education of their children).

In resolving such an impasse, a family court is statutorily-required to base its determination on the best interests of the child. HAW. REV. STAT. § 571-46 (Supp. 2013) ("Custody should be awarded to either parent or to both parents according to the best interests of the child[.]"); *Fujikane v. Fujikane*, 61 Haw. 352, 354, 604 P.2d 43, 45 (1979) ("The critical question to be resolved in any custody proceeding is what action

will be in the best interests of the child." (citing *Turoff v. Turoff*, 56 Haw. 51, 55, 527 P.2d 1275, 1278 (1974))).

Thus, Father's argument that his constitutional rights were violated by the the Family Court's decision is without merit. *Cf. Jordan*, 212 P.3d at 927 (applying the best interests of the child standard despite father's constitutional objections to a private school on religious grounds).

> D. The Family Court erred in failing to consider Father's objections to the religious instruction and admission policies when it considered the best interests of the child.

Father further challenges the Family Court's decision on the basis that he had objections to the religious training provided by Kamehameha and its "racially exclusionary" admission policy. At the hearing, he expressed concerns about the Kamehameha Middle School syllabus, which includes religious education. He also articulated his objection to the Kamehameha admissions policy, which, according to its website, "is to give preference to applicants of Hawaiian ancestry to the extent permitted by law[,]" as being "in opposition to my core values."

Contrary to Father's contention, these considerations do not override Mother's preferences, because as noted, both Father and Mother have a constitutionally-protected liberty interest in the care, custody, and control of son. *In re Doe*, 99 Hawai'i at 533, 57 P.3d at 458. However, setting aside any evaluation of the merits of Father's concerns, the Family Court erred in altogether failing to address those objections as part of its consideration of Son's best interests.

HRS § 571-46(b) sets forth a non-exclusive list of factors that the Family Court may consider when determining what constitutes the best interests of the child in the context of custody awards, including modification of custody awards. HAW. REV. STAT. §§ 571-46(a)(6), § 571-46(b). These factors include "(3) The overall quality of the parent-child relationship;" "(7) The emotional needs of the child;" "(9) The educational needs of the child;" and "(11) Each parent's actions demonstrating that they allow the child to maintain family connections through

family events and activities[.]" *Id.* Although not specifically enumerated in the list at HRS § 571-46(b), Father's objection to the proposed school's religious curriculum and preferential admissions policies is a consideration that would be consistent with those articulated in HRS § 571-46(b), and thus should have been weighed by the Family Court alongside the quality of education offered by the school, etc.[8/]

Other jurisdictions have taken into consideration a parent's religious and cultural preferences, where applicable, as part of making educational determinations based on the best interests of the child. *In re Kurowski*, 20 A.3d 306, 320-21 (N.H. 2011) ("When applying the best interests standard to decide a parenting rights and responsibilities matter, the trial court may consider a parent's religious training of his or her child solely in relation to the welfare of the child."); *Jordan*, 212 P.3d at 929 ("[T]he court must consider whether it is in the best interests of the children to continue attending the private religious school or transfer to another school."); *see also Karetny v. Karetny*, 283 A.D.2d 250, 251 (N.Y. App. Div. 2001) (affirming the lower court's findings that "the longer school day at yeshiva is a source of stress for the child," and therefore adherence to stipulation to educate child at Orthodox Jewish yeshiva is not in child's best interests.); *In re Marriage of Shore*, 734 N.E.2d 395, 403 (Ohio Ct. App. 1999) (holding that there was "competent, credible evidence upon which the trial court could base its decision" that the child's best interests were served by a religious education, despite objections by child's father). In sum, as part of its best interests of the child assessment, the Family Court should have considered Father's objection to Kamehameha's religious curriculum and admissions policy.

---

[8/]     As noted, "the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion." *Fisher*, 111 Hawaii at 46, 137 P.3d at 360. In this case, the issue is not that the Family Court improperly weighed the factors, but rather that by focusing exclusively on the fact that Kamehameha is a private school, it failed to consider Father's objections altogether.

V.   CONCLUSION

For the foregoing reasons, we vacate (1) that portion of the Family Court's Order Re: Plaintiff's Motion for Post-Decree Relief Filed June 6, 2011, entered on September 12, 2012, pertaining to educational decisions and expenses, and (2) FOF 7, FOF 8, COL 2, and COL 3 in the Findings of Fact and Conclusions of Law, filed November 15, 2012.  We remand the case to the Family Court for proceedings consistent with this opinion.[9]


On the brief:

Steven J. Kim
for Defendant-Appellant

---

[9]    Given the passage of time since the entrance of the Family Court's Order, the Family Court may need to conduct a new hearing to take into consideration any changed circumstances.

17