377 P.3d 50

**PO, Petitioner–Appellee,**

v.

**JS, Respondent–Appellant.**

**No. CAAP–15–0000048.**

Intermediate Court of Appeals of Hawai'i.

June 15, 2016.

---

Steven L. Hartley, Elsa F.M. McGehee, (Hartley & McGehee), Kailua, on the briefs, for Respondent–Appellant.

Steven J. Kim, Honolulu, on the briefs, for Petitioner–Appellee.

FOLEY, Presiding J., LEONARD and REIFURTH, JJ.

Opinion of the Court by FOLEY, J.

Respondent–Appellant JS appeals from the (1) December 30, 2014 "Order Re: Trial" and (2) January 21, 2015 "Order Re: Child Support Arrears" both entered in the Family Court of the First Circuit[1] (**family court**).

On appeal, JS contends the family court erred in:

(1) awarding Petitioner–Appellee PO sole legal custody "based primarily on testimony that [JS] did not want to communicate with [PO] except for emergencies and to facilitate visitation with the child";

(2) finding JS "ha[d] not demonstrated a material change in circumstances to warrant a change in the visitation/time-sharing schedule set forth in the ["Stipulated Order Re Paternity, Custody, Visitation, and Support" (**March 2008 Stipulation**) ]";

(3) finding "even if [JS] demonstrated a material change in circumstances to warrant a change in the visitation/time-sharing schedule set forth in the March 2008 Stipulation, the current visitation schedule is reasonable and in the best interests of the child";

(4) "allowing [Rob B. Welch, PhD. (**Dr. Welch**) ] to testify at trial as [JS] did not waive the child's psychologist-client privilege and Dr. Welch's testimony proved to be extremely biased in favor of [PO]";

(5) "finding and concluding that [JS] failed to meet his burden of proof to show that monthly child support warranted modification"; and

(6) finding "monthly child support in the amount of $3,500.00 should have been paid effective February 1, 2011, thus concluding that [JS] owes [PO] $64,490.00 in past due child support." (Emphasis omitted.)

## I. BACKGROUND

JS and PO are the parents of JO (**Child**), born in October 2007. On March 19, 2008, JS and PO filed the March 2008 Stipulation in the family court, which provided:

3. **LEGAL CUSTODY:** Legal custody of the Child is awarded to [PO] and [JS] jointly. Legal custody includes, but is not limited to, decision making authority regarding major medical decisions, the decision as to where the Child should go to school, travel outside of the United States, and major financial decisions.

4. **PHYSICAL CUSTODY:** Physical custody of the Child is awarded to [PO] solely, subject to [JS's] right to time-sharing as set out in this Order.

5. **TIME–SHARING:** [JS] shall have unlimited daytime visitation with the Child when he travels to Hawaii. [PO] shall make efforts to make Child available to spend time with [JS]. [JS] shall give [PO] two weeks notice of travel dates and plans for visitation.

All visitation should be reasonable, as mutually agreed upon by both parties. Nothing in this agreement shall prohibit the parties from agreeing upon additional visits or extended time sharing.

On July 21, 2010, JS and PO filed in the family court a "Stipulation Modifying March 19, 2008 Stipulated Order Re Paternity, Custody, Visitation, and Support" (**July 2010 Stipulation**). The July 2010 Stipulation increased child support payments to $8,500 per month, provided for a college savings account for the Child's benefit to which JS agreed to deposit $2,500 per month, and described plans for timesharing in June and July 2010.

In February 2011, JS and PO agreed to reduce the child support payment to $3,500 per month (**February 2011 Agreement**) because JS had become unemployed in October 2010. The parties did not file a written agreement with the family court reflecting the new agreement.

Until July 2012, JS's visitations with the Child in Hawai'i and on the mainland were worked out cooperatively between JS and PO. In July 2012, the Child, who was four years old at the time, was visiting JS in Florida without the accompaniment of PO. Believing he had been left alone, the Child called the police because he was scared. JS did not call PO to inform her of the incident.

---

1. The Honorable Jennifer L. Ching presided.

A few months later, in November 2012, the Child was visiting Washington for JS's wedding, again without the company of PO. JS was arrested two days before his wedding, but was not charged. JS did not call PO to inform her of his arrest.

In December 2012, JS began making child support payments in the amount of $1,500 per month. JS attributed the reduced payments to the depletion of his savings due to his wedding expenses and payment of his debts.

On August 19, 2013, JS filed a "Motion for Relief after Judgment or Order and Declaration" requesting a recalculation of child support and modification of the visitation/time-sharing schedule. On September 18, 2013, PO filed a "Motion to Award [PO] Sole Legal Custody, Enforce [July 2010 Stipulation], and for Attorney's Fees."

The family court held a trial on the parties' motions on June 16, 17, 25, September 8, 9, and 16, 2014. At trial, both parties testified about the acrimonious nature of their relationship that had emerged over the two years prior to trial. JS testified that he did not want an on-going relationship with PO and that he wanted no communication from her except for email contact regarding emergencies or notices of visitation.

On December 30, 2014, the family court entered the "Order Re: Trial" awarding PO with sole legal custody, enforcing the March 2008 Stipulation with regard to school expenses and time-sharing, and determining JS's child support obligation to be $3,500 per month. The family court entered the "Order Re: Child Support Arrears" on January 21, 2015, determining that JS owed PO for child support arrears through January 2015 in the amount of $64,490. JS filed his notice of appeal on January 28, 2015. The family court entered its "Supplemental Record on Appeal Findings of Fact and Conclusions of Law" on August 18, 2015. (Brackets omitted.)

## II. STANDARD OF REVIEW

### A. Family Court Decisions

Generally, the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion. Thus, we will not disturb the family court's decision on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

*Kakinami v. Kakinami*, 127 Hawai'i 126, 136, 276 P.3d 695, 705 (2012) (quoting *Fisher v. Fisher*, 111 Hawai'i 41, 46, 137 P.3d 355, 360 (2006)).

### B. Findings of Fact and Conclusions of Law

The family court's [findings of fact (**FOF**) ] are reviewed on appeal under the "clearly erroneous" standard. A FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*Kakinami*, 127 Hawai'i at 136, 276 P.3d at 705 (quoting *Fisher*, 111 Hawai'i at 46, 137 P.3d at 360).

A family court's conclusions of law (**COL**) are reviewed de novo. *Balogh v. Balogh*, 134 Hawai'i 29, 38, 332 P.3d 631, 640 (2014).

### C. Evidentiary Rulings

■ "We apply two different standards of review in addressing evidentiary issues. Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard." *Inoue v. Inoue*, 118 Hawai'i 86, 93, 185 P.3d 834, 841 (App.2008) (quoting *State v. Ortiz*, 91 Hawai'i 181, 189, 981 P.2d 1127, 1135 (1999)).

### D. Material Change in Circumstances

■ "Whether a substantial and material change has been presented is reviewed under the right/wrong standard." *Hollaway v.*

*Hollaway,* 133 Hawai'i 415, 421, 329 P.3d 320, 326 (App.2014) (citing *Davis v. Davis,* 3 Haw. App. 501, 506, 653 P.2d 1167, 1171 (1982)).

## III. DISCUSSION

### A. Psychologist–Client Privilege

JS argues that the testimony provided by the Child's therapist, Dr. Welch, was admitted in violation of the psychologist-patient privilege. JS contends that under Hawaii Rules of Evidence (**HRE**) Rule 504.1(b) (Supp.2015), a child and both parents are authorized to claim the psychologist-patient privilege, and the circuit court erred in allowing Dr. Welch's testimony over JS's objection.

HRE Rule 504.1 provides in relevant part:

**Rule 504.1 Psychologist-client privilege.**

. . . .

(b) General rule of privilege. A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of the client's mental or emotional condition, including substance addiction or abuse, among the client, the client's psychologist, and persons who are participating in the diagnosis or treatment under the direction of the psychologist, including members of the client's family.

. . . .

(d) Exceptions.

. . . .

(3) Condition an element of claim or defense. There is no privilege under this rule as to a communication relevant to the physical, mental, or emotional condition of the client in any proceeding in which the client relies upon the condition as an element of the client's claim or defense or, after the client's death, in any proceeding in which any party relies upon the condition as an element of the party's claim or defense.

JS objected at trial to Dr. Welch's testimony regarding the discussions he had with the Child at the Child's therapy sessions under the psychologist-patient privilege. The family court overruled the objection, presumably based on PO's position that Dr. Welch's testimony regarding how JS's inconsistent contact with the Child had affected the Child was "central to the paramount issue" and therefore subject to the HRE Rule 504.1(d)(3) exception. JS relies on *Sussman v. Sussman,* 112 Hawai'i 437, 146 P.3d 597 (App.2006) to argue that "seeking custody of one's children is not tantamount to relying on one's mental or emotional condition as an element o[f] a claim or defense, and accordingly, does not trigger the rule 504.1(d)(3) exception."

In response to JS's argument, PO cites *Hollaway,* in which this court held, "where joint custodial parents are deadlocked regarding an important decision implicating their child's future or welfare, such an impasse qualifies as a material change in circumstances sufficient to warrant the [family court's] consideration of a change in the custody order's terms with respect to the deadlocked matter." *Hollaway,* 133 Hawai'i at 422, 329 P.3d at 327. Specifically, PO points to this court's statement, "There is ... no infringement on [constitutionally protected liberty interests in the right of parents to direct the upbringing of their children] when a court, properly interposed between two parents, each equally vested with such rights, resolves an impasse between them regarding the exercise of those rights." *Id.* at 423, 329 P.3d at 328. *Hollaway,* however, does not guide our decision. *Hollaway* involved the fundamental right of a parent to determine the school their child would attend. *Id.* at 416, 329 P.3d at 321. Here, we consider whether one parent can waive the statutory psychologist-patient privilege over the objection of another parent. Our focus is not on whether the family court may act as tie-breaker, but whether the child's mental and/or emotional condition is an element in determining child custody and child support under the HRE Rule 504.1(d)(3) exception.

██ In cases involving a dispute as to the custody of a minor child, the court is required to evaluate the "best interests of the child." HRS § 571–46(a) (Supp.2015); *see AC v. AC,* 134 Hawai'i 221, 230, 339 P.3d 719,

728 (2014). PO offered Dr. Welch's testimony at trial as pertinent to "what would be better for the [Child]" and "how the prior contacts or lack of contacts [with JS] have impacted [the Child]."

■■■■ By statute, the family court considers several factors in determining the best interests of the child. *See* HRS § 571–46(b) (Supp.2015).[2] No one factor is dispositive of a family court's best interests of the child determination. We agree with JS's position that the child's emotional and/or mental condition was not an "element" of the family court's best interests of the child analysis, although it is a highly relevant factor.

This court in *Sussman* considered whether a parent of a child, who has made a confidential communication for the purpose of diagnosis or treatment of the parent's mental or emotional condition and is seeking physical child custody and visitation, has a privilege to prevent the psychologist from testifying about the confidential communication. *Sussman*, 112 Hawai'i at 442, 146 P.3d at 602. We answered that the parent was able to claim the privilege, and the HRE Rule 504.1(d)(3) exception did not apply because it required the parent who sought treatment "to rely upon his 'mental or emotional condition' as an element of his claim or defense." *Id.* at 443, 146 P.3d at 603.

■■■■ The mental health of each parent is an explicitly relevant factor in determining the best interests of a child. HRS § 571–46(b)(14). Yet in *Sussman*, we determined that "the HRE Rule § 504.1(d)(3) exception requires more than relevance." *Sussman*, 112 Hawai'i at 443, 146 P.3d at 603. Similarly, while a child's mental and emotional state is without a doubt a relevant and important factor in the family court's determination of the best interests of the child, *see* HRS § 571–46(b)(7), we cannot say that it is an "element" of a claim or defense either party has brought into question. Therefore, the HRE Rule 504.1(d)(3) exception does not apply and the family court erred in deciding to admit Dr. Welch's testimony under this exception. *See Kealoha v. City. of Hawaii*, 74 Haw. 308, 319, 844 P.2d 670, 676 (1993) ("When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard.").

■■■■ We next address the dispute between JS and PO over the right of each parent to assert or waive the psychologist-patient privilege on behalf of the child. Under the rules of evidence, "[t]he [psychologist-patient] privilege may be claimed by the client, the client's guardian or conservator, or the personal representative of a deceased client. The person who was the psychologist at the time of the communication is presumed to

---

2. The family court is required to consider, at a minimum, certain enumerated factors:
 (1) Any history of sexual or physical abuse of a child by a parent;
 (2) Any history of neglect or emotional abuse of a child by a parent;
 (3) The overall quality of the parent-child relationship;
 (4) The history of caregiving or parenting by each parent prior and subsequent to a marital or other type of separation;
 (5) Each parent's cooperation in developing and implementing a plan to meet the child's ongoing needs, interests, and schedule; provided that this factor shall not be considered in any case where the court has determined that family violence has been committed by a parent;
 (6) The physical health needs of the child;
 (7) The emotional needs of the child;
 (8) The safety needs of the child;
 (9) The educational needs of the child;
 (10) The child's need for relationships with siblings;
 (11) Each parent's actions demonstrating that they allow the child to maintain family connections through family events and activities; provided that this factor shall not be considered in any case where the court has determined that family violence has been committed by a parent;
 (12) Each parent's actions demonstrating that they separate the child's needs from the parent's needs;
 (13) Any evidence of past or current drug or alcohol abuse by a parent;
 (14) The mental health of each parent;
 (15) The areas and levels of conflict present within the family; and
 (16) A parent's prior wilful misuse of the protection from abuse process under chapter 586 to gain a tactical advantage in any proceeding involving the custody determination of a minor.
HRS § 571–46(b) (Supp.2015).

have authority to claim the privilege but only on behalf of the client." HRE Rule 504.1(c).

 Other jurisdictions have considered the tension between the rights of parents and the rights of their children that emerges when a child has made a confidential communication to a psychologist.[3] The weight of authority on the issue leads us to the conclusion that in cases in which the parents are involved in litigation themselves and where the child's mental state is relevant to litigation, the parents are precluded from asserting or waiving the privilege on their child's behalf. *See Attorney ad Litem for D.K. v. Parents of D.K.*, 780 So.2d 301, 307 (Fla.Dist. Ct.App.2001) ("Where the parents are involved in the litigation themselves over the best interests of the child, the parents may not either assert or waive the privilege on their child's behalf."); *Bond v. Bond*, 887 S.W.2d 558, 560 (Ky.Ct.App.1994) ("[W]e see no logic in permitting one or both of the parents in a custody battle to assert the psychotherapist-patient privilege on behalf of their child, especially when the child's mental, emotional, and/or physical well-being is the key issue in the custody dispute. Oftentimes, one parent, at least, will have a significant motivation to prevent full disclosure, to the detriment of the child."); *Nagle v. Hooks*, 296 Md. 123, 460 A.2d 49, 51 (1983) ("[T]he appointment of a neutral third party would eliminate the very real possibility, as may exist in this case, of one of two warring parents exercising the power of veto for reasons unconnected to the polestar rule of 'best interests of the child.'"); *In re Berg*, 152 N.H. 658, 886 A.2d 980, 987 (2005) ("We conclude that parents do not have the exclusive right to assert or waive the privilege on their child's behalf.").

Different approaches have emerged as to how trial courts are to resolve the assertion or waiver of a child's psychologist-patient (or related) privilege when the child's mental or emotional state is at issue in litigation. One approach is to require the trial court to appoint a guardian to assert or waive the privilege on behalf of a child. *See Attorney ad Litem for D.K.*, 780 So.2d at 308 ("A child less than twelve years old does not have the emotional maturity or capacity of a seventeen year old. A court faced with the child's desire to assert the privilege in such circumstances should determine whether the child is of sufficient emotional and intellectual maturity to make the decision on his or her own. If the court decides that the child is sufficiently mature, then the court should appoint an attorney ad litem to assert the child's position, as the court did here."); *Nagle*, 460 A.2d at 51 ("[W]e hold that when a minor is too young to personally exercise the privilege of nondisclosure, the court must appoint a guardian to act, guided by what is in the best interests of the child.").

Another approach is to leave the trial court with broad discretion in determining how and what testimony to admit. *See Bond*, 887 S.W.2d at 561 ("We will not attempt to require any specific procedure by the trial court, but allow broad discretion. The judge may personally and directly interview the therapist to determine what, if any, information is relevant and material for disclosure; or, the judge may appoint a guardian ad litem ... for the sole purpose of determining the best interests of the child and for recommending whether, and to what extent, the privilege should be waived."); *In re Berg*, 886 A.2d at 987 ("We refrain from establishing a detailed procedure through which the privilege should be waived or asserted, and instead leave that determination to the sound discretion of the trial court.").

 We agree with the conclusion of the courts of other jurisdictions in that where the parents are involved in the litigation themselves over the best interests of the child, the parents may not either assert or waive the privilege on their child's behalf.[4]

---

**3.** A "psychologist," under HRE Rule 504.1(a)(2), is "a person authorized, or reasonably believed by the client to be authorized, to engage in the diagnosis or treatment of a mental or emotional condition, including substance addiction or abuse."

**4.** In *Bond*, the Kentucky Court of Appeals explained the potential for parents to forget the best interests of their child or children:

We have considered this case with deep concern about the apparent oversight of the children's rights in this case. This dispute, however, is no different from other custody disputes

We believe the family court is in the best position to determine whether a child is emotionally and intellectually mature enough to personally assert or waive privilege, and thus do not mandate a particular process by which the family court must act. If the child is not sufficiently mature to assert or waive privilege, the family court is within its discretion to appoint an independent guardian ad litem solely for the purpose of the privilege issue, or to rely on the existing guardian ad litem. *See* HRS § 551–2 (2006 Repl.).[5]

 Under the circumstances of this case, neither JS nor PO may assert or waive the psychologist-patient privilege. We remand to the family court with instructions to determine whether asserting or waiving the privilege is in the best interests of the Child. If appointing a guardian ad litem would be helpful to the determination, the family court may appoint one as it deems necessary.

## B. Legal Custody Award

 JS challenges the family court's conclusion that there had been a material change in circumstances to justify a change in legal custody[6] and the family court's award of sole legal custody to PO. JS argues,

> In granting [PO] sole legal custody of the [Child], the [family court] is limiting [JS's] rights, a fundamental interest, solely because of communication issues between the parties. If the court believes that it is impossible to co-parent and have joint legal custody over a child without communication, then [JS] should in turn be awarded

sole legal custody of the [Child] as [PO's] inappropriate and overbearing actions are what led to the communication breakdown in the first place.

> In the alternative, if the Court believes that co-parenting is possible, even in highly acrimonious situations such as this one, the [family court] should be directed to issue a ruling on how and to what extent the parties can communicate so that they can co-parent. This will in turn allow for a joint custody arrangement that is more in line with the [Child's] best interests. There will always be cases where the parties cannot communicate well with one another. This should not lead to an automatic conclusion that one party must be granted sole legal custody of the child.

 The party seeking modification of a joint legal custody order "must first make a threshold showing of material change in circumstances." *Hollaway*, 133 Hawai'i at 421, 329 P.3d at 326.

In the March 2008 Stipulation, which was the only agreement on the legal custody of the child, JS and PO agreed to joint legal custody. The family court described the relationship between JS and PO after their cooperative relationship began to deteriorate in July 2012:

> 7. [JS] testified, and the Court finds, that [JS] does not have a current relationship with [PO]: he does not want an ongoing relationship with [PO]; his view is there is no benefit to [PO], [JS] or the

where the child becomes the pawn—the prize after which two people seek—no matter what the effect is on the child. Society expects that a mother and father are the ones most likely concerned with the best interests and well-being of their child and, under normal circumstances, this is true. However, when custody of the child becomes the subject of a bitter contest between mother and father, the personal interests of the contestants in almost all cases obliterate that which is in the best interests of the child. It is at this point that it can be said the interests of both parents become potentially, if not actually, adverse to the child's interests.

*Bond*, 887 S.W.2d at 560.

5. HRS § 551–2 provides in relevant part:
 **§ 551–2 Guardian ad litem; next friend; appointment.**

Nothing in this chapter impairs or affects the power of any court to appoint a guardian to defend the interests of any minor … or its power to appoint or allow any person as next friend for a minor, to commence, prosecute, or defend any action or proceeding in the minor's behalf[.]

6. "Legal custody" under HRS § 571–2 (2006 Repl.) is defined as:
 the relationship created by the court's decree which imposes on the custodian the responsibility of physical possession of the minor and the duty to protect, train, and discipline the minor and to provide the minor with food, shelter, education, and ordinary medical care, all subject to residual parental rights and responsibilities and the rights and responsibilities of any legally appointed guardian of the person.

Child; and he feels that less communication with [PO] is better.

8. [JS] testified, and the Court finds, that he wants only e-mail contact from [PO] regarding emergencies regarding the Child. *See* Exhibit M–13, a text from [JS] to [PO] which states:

> First off your of Fuckin piece of shit that has never done anything for yourself. You have nothing. Have done nothing are nothing accept a Fuckin leach. You have done nothing but steal money from me and try to justify it by saying its for my son. You're a piece of shit. And you don't deserve or warrent my time or any time. I don't ever wanna hear your greedy voice again. Have my son skype me on tuesdays and thursdays at seven pm pacific time. Don't ever call or attempt to speak to me again. You are less than nothing. Your whole existsance is a joke and you know it. Stop poisoning my son with your weakness and hate. You have already heard from my attorny you hold diggin bitch. And I will see your filthy ass in court. Fuck you.

. . . .

9. [JS] sent an e-mail to [PO] on March 9, 2013 which included "there is no reason for you to be emailing me other than an emergency or a two week notice of visitation as agreed upon in mediation. Do not sent me texts or pictures or emails ever unless it falls under one of those two categories[.]"

10. At one point, [JS] told [PO] that she may address him as "Mr. [S]" . . . .

11. [JS's] stated position that the only communication he wants from [PO] is e-mails regarding an emergency or a two week notice of visitation makes joint legal custody not feasible, and not in the best interests of the Child. [JS] testified that his last phone call with [PO] was in 2012.

(Mistakes in original; brackets and citations to record omitted.)

This court has held that an "extraordinarily high level of conflict between ... parents, notwithstanding the many attempts to encourage and/or aid the parties through medi-ation, professional services, and prior court orders, qualifie[s] as a material change in circumstances," especially where there is a "lack of specificity and clarity in the original custody and visitation provisions[.]" *Carr v. Buenger*, No. CAAP–11–0000545 at *11, 2014 WL 2440185, 133 Hawaiʻi 452 (App. May 30, 2014) (mem.). Here, there was no lack of clarity in the original legal custody agreement—the parties were clearly awarded joint legal custody. However, the parties' deteriorating relationship to the point that there was no communication between them except "regarding an emergency or a two week notice of visitation" is sufficient in these circumstances to constitute a material change in circumstances, because joint legal custody requires parents to make decisions together for the child's basic needs. JS has suggested that joint legal custody without communication is possible, but makes no suggestion of an arrangement between JS and PO that would mitigate the changed circumstance. Therefore, the circuit court did not err in concluding that PO had established a material change in circumstances warranting the award of sole legal custody to PO.

## C. Modification of the 2008 Stipulated Order Regarding Visitation/Time–Sharing

### 1. Material Change in Circumstances

JS challenges the family court's conclusion that he had not demonstrated a material change of circumstances to warrant a change of the visitation schedule set forth in the March 2008 Stipulation. JS contends that there are four bases for concluding that there was a material change in circumstances: (1) "the [Child] has matured from being an infant in 2008 to an elementary school aged boy in 2014"; (2) "the [Child's] schedule has changed in that he is now in school for a majority of the year, thus limiting [JS's] potential timesharing with him"; (3) "[PO] continuously violated the [March] 2008 Stipulation by aligning the [Child] against [JS and JS's] wife, by not encouraging a positive parent-child relationship between the [Child] and [JS], and by interfering with the parent-child relation-

ship between [JS] and the [Child]"; and (4) "there has been an increase in acrimony between the parties."

"A person seeking a change in visitation must show a material change in circumstances since the previous visitation order." *In re Guardianship of Doe*, 93 Hawai'i 374, 388, 4 P.3d 508, 522 (App.2000) (citing *Nadeau v. Nadeau*, 10 Haw.App. 111, 121, 861 P.2d 754, 759 (1993)). "[T]he question is whether substantial change has occurred since the initial [order] requiring modification or change in the award of custody of the minor child." *Turoff v. Turoff*, 56 Haw. 51, 55, 527 P.2d 1275, 1278 (1974).

The March 2008 Stipulation, the most recent agreement on visitation and time-sharing, granted JS "unlimited daytime visitation with the Child when [JS] travels to Hawaii.... All visitation should be reasonable, as mutually agreed upon by both parties. Nothing in the agreement shall prohibit the parties from agreeing upon additional visits or extended time-sharing."

Regarding JS's request for modification of the March 2008 Stipulation, the family court held that JS did not demonstrate a material change in circumstances. The family court held in the alternative that the visitation/time-sharing schedule in the March 2008 Stipulation "is reasonable and is in the best interests of the Child." In support of its conclusion, the family court found:

13. There was testimony from both [JS] and [PO], and the Court finds, that [JS] has had additional visits and extended time-sharing with the Child beyond unlimited daytime visitation with the Child in Hawaii.

14. Until July 2012, visitations were worked out cooperatively between the parents. [JS] had time with the Child in Hawaii and on the mainland, which included [JS] having visitation with the Child for periods of time of up to approximately three weeks.

JS's first two bases for modification are related to the fact that the child is now in elementary school. At the time JS and PO agreed to allow JS "unlimited daytime visitation" in Hawai'i, their child was approximately five months old. JS also argues that PO violated the March 2008 Stipulation by aligning the child against JS and interfering with JS's relationship with the child. JS does not provide any support for this position. Relatedly, JS argues that there is an increase in acrimony between the parties. The family court noted that before the parties' disagreement began, there was a history of extended visitation/time-sharing, in which "visitations were worked out cooperatively between the parents." The family court's FOFs 7–11, excerpted above, describe the deterioration of communication in a once cordial and cooperative relationship.

The March 2008 Stipulation relied substantially on the parties' ability to come to agreements about visitation and assumed a cooperative relationship. The evidence in the record shows that the parties' relationship now involves an "extraordinarily high level of conflict," in which JS has stated that the only contact he permits from PO is "e-mails regarding an emergency or a two week notice of visitation...."

We agree that JS has demonstrated a material change of circumstances and that the circuit court's conclusion otherwise was in error. *See Hollaway*, 133 Hawai'i at 421, 329 P.3d at 326; *Carr*, mem. op. at *11.

## 2. Best Interests of the Child

JS challenges two of the family court's justifications for concluding that the existing visitation/time-sharing schedule was in the best interests of the child, which include, "(1) Two incidents which occurred during the child's mainland visitations with [JS] and (2) on the testimony presented by Dr. Rob Welch."

The family court relied on Dr. Welch's testimony in its FOFs 25–31. Because we remand to the family court on the issue of the admission of Dr. Welch's testimony, which is relevant to whether the March 2008 Stipulation's visitation/time-sharing schedule was in the best interests of the child, we remand to the family court to reevaluate whether the schedule is in the best interests of the child.

### D. Child Support Modification

#### 1. Most Recent Enforceable Agreement

■ JS contends the last enforceable child support agreement was the July 2010 Stipulation for $8,500 per month and was not the February 2011 Agreement for $3,500 per month. Additionally, JS challenges the family court's finding that "his last employment [with the National Football League (**NFL**) was] at the end of 2009, into 2010; he was released as a result of performance lacking and conduct detrimental." JS argues that this error is significant because he became unemployed _after_ the July 2010 Stipulation, which constituted a material change in circumstance such that the July 2010 Stipulation could be modified.

Regarding the February 2011 Agreement, the family court stated:

36. The Court finds that on or about February of 2011, [JS] and [PO] agreed to the reduction of child support to $3,500 per month (from $8,500 per month), and ordered that [JS] pay monthly child support of $3,500 commencing February 1, 2011. The Court ordered the $3,500 per month child support notwithstanding that: (1) no written agreement or order was filed at that time; (2)[PO] viewed the agreement as conditional; and (3)[JS] testified that the parents agreed to further reductions in the monthly amount of child support.

37. [PO] testified that she viewed the $3,500 per month child support agreement as conditional (conditions including that [JS] have open communication with [PO], that [JS] not stop making child support payments without talking to [PO] first, that they not litigate in court). [JS] testified that he didn't agree that the $3,500 monthly child support amount was accurate. The Court finds that the parents agreed to reduce the child support to $3,500 per month. The Court also notes that both parents had an attorney at the time of the agreement to the $3,500 monthly child support. [PO] testified that when [PO] told [Katherine Bennett, PO's previous attorney], months later, about the agreement, Ms. Bennett was upset that [PO] had agreed to the $3,500 per month child support.

PO testified at trial that in October 2010 JS was released from the NFL. PO explained that following his release, PO and JS agreed to modify JS's child support obligations:

[PO's counsel] Okay. [October of 2010] is when [JS] was released by the NFL?

[PO] Correct. And then he had a visit in mid December to Hawaii. And at this point he was friendly with me; he was able to come over and eat at my house and he played with [Child]. And at that point he said, you know, things have changed for me financially, would you agree—he said I remember what your expenses were, would you agree to lowering child support to 3,500? And I said if you promise that you're not going to do this thing where you just cut child support without interacting with me, I said as long as you don't—if you, you know, like stop talking bad about me to friends, you know, 'cause we have similar friends because we went to Udub, and I said as long as you have open communication, you know, you don't have time periods where you just absolutely don't connect with me, then that's fine, we can drop it to 3,500.

[PO's counsel] And did any order ever get entered for that?

[PO] No, it didn't. And [Ms. Bennett] was upset with me when I told her months later that I had agreed to drop it.

JS began to pay the reduced amount of $3,500 beginning in February 2011. PO testified that there were no changes until December 2012, when JS "unilaterally decided to cut child support without ever saying anything to me."

JS testified that there was an agreement to modify the child support subsequent to the February 2011 Agreement. The family court found that this testimony was not credible. The family court's credibility finding as to JS's testimony regarding a subsequent modification in 2012 cannot be reversed on appeal. _See In re Doe,_ 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001) ("It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province, of the trier of fact." (ellipsis and brack-

ets omitted) (quoting *State v. Jenkins*, 93 Hawai'i 87, 101, 997 P.2d 13, 27 (2000)).

The family court's finding that the most recent agreement regarding child support payments was made in February 2011 following the termination of JS's employment with the NFL is supported by substantial evidence in the record, and is therefore not clearly erroneous. *See Balogh*, 134 Hawai'i at 38, 332 P.3d at 640.

### 2. Changed Circumstances Affecting JS's Ability to Pay Child Support

■ JS argues that even if the February 2011 Agreement was the most recent child support agreement, there was a material change in circumstances that warranted a reduced child support obligation. JS argues that subsequent to the agreement, he (1) expended $200,000 on his November 2012 wedding and (2) paid off all of his debts because "it was very important for [him] to pay off his debts so that he started off his marriage without debts."

The family court's relevant findings were:

39. At the time that parents agreed to reduce the monthly child support to $3,500, [JS] was retired from the National Football League ("NFL"). When asked how he made child support payments even though he was retired, [JS] testified, and the Court finds, that he had money accumulated from his employment with the NFL.

40. [JS] and his wife both testified, and the Court finds, that [JS] paid all of the $200,000.00 expenses for their wedding in November of 2012, and that it was very important to [JS] that he pay off his debts so that he started off their marriage without debts.

. . . .

43. [JS] chose to make his payment of the entire costs of the wedding and paying off his debts priorities over the support of his Child.

7. HRS § 584–15(e) provides in relevant part:
§ 584–15 Judgment or order. . . .
(e) In determining the amount to be paid by a parent for support of the child and the period during which the duty of support is owed, a court enforcing the obligation of support shall

44. In December of 2012, the month after his marriage, [JS] started to make monthly child support payments of $1,500, which was less than what had been agreed to by the parents ($3,500 per month). . . .

. . . .

47. [JS] has not applied for work since he graduated from college in 2013.

. . . .

49. There was no written evidence that [JS] is disabled, or unable to work.

. . . .

52. [JS] failed to meet his burden of proof to show that the $3,500 monthly child support agreed to should be modified, or the amount of any warranted modification.

53. There has not been any material change of circumstances from the time when [JS] agreed to child support in the amount of $3,500 per month.

■ A party seeking modification of a child support obligation must show that there has been "a substantial and material change in the relevant circumstances so as to permit consideration of the modification request." *Davis v. Davis*, 3 Haw.App. 501, 506, 653 P.2d 1167, 1170 (1982).

We agree with the family court's conclusion that JS's wedding expenses and debt payments, which JS testified depleted his savings, do not constitute a material change in circumstances sufficient to warrant a modification of February 2011 Agreement regarding child support.

### E. Child Support Guidelines

■ JS contends the family court erred because it was required under HRS § 584–15(e) (2006 Repl.) [7] to calculate JS's child support obligations based on Child Support Guidelines (**Guidelines**).

■ HRS § 571–52.5 (2006 Repl.) provides, "When the court establishes or modifies the amount of child support required to

use the guidelines established under section 576D–7. Provision may be made for the support, maintenance, and education of an adult or minor child and an incompetent adult child, whether or not the petition is made before or after the child has attained the age of majority.

be paid by a parent, the court shall use the guidelines established under section 576D–7, except when exceptional circumstances warrant departure." Agreements for child support payments in excess of the amount dictated by the Guidelines are considered an "exceptional circumstance" under which a family court is permitted to order the amount greater than the amount specified by the Guidelines. *See Hartman v. Thew*, 101 Hawai'i 37, 42, 61 P.3d 548, 553 (App.2002) ("This court has concluded that the agreement of the parties [to an amount in excess of the Guidelines] is an exceptional circumstance authorizing the family court to order [the amount in excess of the Guidelines].").

■ While HRS § 584–15(e) does not provide a statutory exception to the rule requiring family courts to use the Guidelines, we conclude that the two provisions do not conflict. *See State, Child Support Enf't Agency v. Doe*, 98 Hawai'i 58, 63–64, 41 P.3d 720, 725–26 (App.2001) (holding that effect could be given to both HRS § 571–52.5 and HRS § 584–15(d) (2006 Repl.)).[8]

While the family court made no specific finding or conclusion regarding whether the February 2011 Agreement was an "exceptional circumstance," we cannot conclude that enforcing the February 2011 Agreement without reliance on the Guidelines was a manifest abuse of discretion. *See Kakinami*, 127 Hawai'i at 136, 276 P.3d at 705.

## F. Past Due Child Support

### i. HRS § 584–15(d)

■ JS argues that under HRS § 584–15(d),[9] the family court should have taken

into account that he had paid PO more than the child needed in monthly expenses.

■ HRS § 584–15(d) allows, but does not require, a family court to order a lump sum payment or the purchase of an annuity in lieu of periodic payments, or to limit a parent's liability for past support. JS does not argue, nor do we conclude, that the family court abused its discretion by not limiting JS's past due support obligations in proportion to the payments he had already made. Therefore, the court did not err.

### ii. Doctrine of Laches

■ JS also argues that PO "should have been barred from requesting past due support from [JS] under the principle of laches." JS argues that because PO waited from December 2012, when JS began paying only $1,500 in child support, to November 2013, when PO challenged the reduced child support payment, PO should be precluded from challenging the reduced child support amount.

■ The doctrine of laches requires that there was "a delay by the plaintiff in bringing his claim, and that delay must have been unreasonable under the circumstances." *Adair v. Hustace*, 64 Haw. 314, 321, 640 P.2d 294, 300 (1982) (citing W. McClintock, Equity § 528 at 71 (2d ed.1948)). We hold that under the circumstances of this case, which involves a history of agreements between the parties and the resolution of disagreements without intervention by the court, the eleven month delay was not unreasonable. The family court did not abuse its discretion in declining to apply the doctrine of laches. *See Kakinami*, 127 Hawai'i at 136, 276 P.3d at 705.

---

8. In *Doe*, we explained that the enactment of HRS § 571–52.5, in 1986 was not meant to repeal HRS § 584–15(d), which was enacted and remained unchanged since 1975. *Doe*, 98 Hawai'i at 63, 41 P.3d at 725. We elaborated that HRS chapter 571 "governs the family courts in general" while "[t]he chapter containing HRS § 584–15(d) ... is concerned specifically and exclusively with actions to establish the paternity of a child and to obtain child support, reimbursement and other relief[.]" *Id.* We concluded, "it cannot be said as a matter of statutory construction that [HRS § 571–52.5] ousts [HRS § 584–15(d) ] in the matter of past child support." *Id.*

9. HRS § 584–15(d) provides in relevant part:

**§ 584–15 Judgment or order ....**
(d) Support judgment or orders ordinarily shall be for periodic payments which may vary in amount. In the best interest of the child, a lump sum payment or the purchase of an annuity may be ordered in lieu of periodic payments of support. The court may limit the father's liability for past child support of the child to the proportion of the expenses already incurred that the court deems just.

124

## IV. CONCLUSION

The (1) December 30, 2014 "Order Re: Trial" and (2) January 21, 2015 "Order Re: Child Support Arrears" both entered in the Family Court of the First Circuit are vacated in part and this case is remanded to evaluate whether the admission of Dr. Welch's testimony was in the best interests of the child and for proceedings regarding whether a modification of the visitation schedule was in the best interests of the child. The orders are affirmed in all other respects.